JUDSON E. TIFFANY v. THE COMMONWEALTH.

ERROR TO THE COURT OF OYER AND TERMINER OF SUSQUE-
HANNA COUNTY.

Argued March 12, 1888—Decided October 1, 1888.

1. Malice is an essential ingredient of murder, either of the first or second degree, and while its existence may be presumed from certain proved or admitted facts, the presumption is not necessarily conclusive; it is not a presumption juris et de jure, but a rebuttable presumption.

2. The presumption from an unlawful killing that it is murder, may be rebutted or so far weakened by evidence of other facts accompanying the act, as to create in connection with the legal presumption of innocence, a reasonable, substantial doubt as to the guilt of the accused and entitle him to an acquittal or to a reduction of the grade from murder to manslaughter.

3. In criminal cases, the burden of proof never shifts but rests on the prosecution throughout, so that, in all cases, conviction can only be had after the jury have been convinced of the defendant's guilt beyond a reasonable doubt; hence, if from any, or from all the evidence taken together, a reasonable doubt of guilt is raised, there should be an acquittal.

4. When, therefore, on a trial for murder there was evidence tending to show that an attack was made upon defendant, so violent as to warrant him in believing that he was in danger of great bodily harm or loss of life unless he used a pistol in self-defence, it was error to refuse to charge that if that evidence raised a reasonable doubt of the crime of murder in the second degree, it would operate to acquit of it.

5. It was also error, in such case, to charge that "if the facts and circumstances are in evidence, no matter by whom produced, which make the extenuation which reduces [the grade of the crime], they have the effect to reduce it, but the facts and circumstances must be more than sufficient to raise a reasonable doubt."

6. While one has the right to order a trespasser from his premises, he has no right to follow him up until an attack is made upon himself so fierce as to put him to the necessity of taking the life of the trespasser in self-defence.

7. If there is testimony tending to show that the defendant, on trial for murder, was assaulted by the deceased and another, and the life of the deceased was taken in self-defence, evidence is admissible that such other person was reputed to be bad-tempered and quarrelsome, and the fact was known to the defendant at the time of the homicide.

Charge of Court below.

Before GORDON, C. J., PAXSON, STERRETT, CLARK and WILLIAMS, JJ.; TRUNKEY and GREEN, JJ., absent.

No. 379 January Term 1887, Sup. Ct.; court below, No. 1 August Term 1886, O. & T.

On August 9, 1886, Judson E. Tiffany on arraignment pleaded not guilty to an indictment, returned a true bill, charging him with the murder of Samuel Hocum on July 15, 1886. The facts appearing on the trial, were in substance that Lafayette Crandall and Samuel Hocum, on the day of the homicide, were in a field belonging to the prisoner and were there engaged in picking berries, when the prisoner ordered them out of the field. As they were on the way toward the public road, an altercation occurred with the prisoner who was following them, when the latter drew a revolver and shot Hocum. The accounts of the matter in the testimony upon both sides are clearly stated in the early part of the charge of the court below.

In the prisoner's behalf, J. K. Aldrich was called:

Q. Are you acquainted with Lafayette Crandall? A. Yes, sir.

Q. Do you know what his general character and reputation is, as to being quarrelsome,—from the speech of the people? Objected to.

Mr. McCollum: We offer to prove by this witness and twenty-five others that Lafayette Crandall has a notoriously bad reputation as a quarrelsome, bad-tempered, dangerous man, and that all this was known to Judson Tiffany on July 15, 1886, at the time of the shooting. Objected to, that it is irrelevant and immaterial.

By the court: Objection sustained, and offer refused. 6

At the close of the case on the evidence, the court, McCOLLUM, P. J., charged the jury and answered certain points presented as follows:

On the 15th day of July last, Samuel Hocum was slain by the prisoner at the bar. The evidence establishes this, and it is admitted by the prisoner. There are two versions of the circumstances accompanying and surrounding this homicide. The case as presented by the commonwealth, in the evidence

of Lafayette Crandall, is briefly and substantially this: On July 15, last, Crandall and Hocum were living together in a house not far from Stephen Tiffany's. Crandall had married Hocum's daughter. Not far from one o'clock in the afternoon, they went to Stephen Tiffany's, where they remained until near three o'clock, when each took a small pail, and together they went into the field of Judson Tiffany, to pick berries. When they got to the upper side of the field, near the brush, they saw Judson Tiffany, who ordered them out of the lot, when they came within a few feet of him. Hocum was nearer to the prisoner than Crandall was. Crandall heard no talk between Hocum and the prisoner until they were ordered out of the lot by him. Crandall and Hocum started to leave the lot, Crandall saying to Hocum, " this is no place for us, let us get out." And as they started to go out of the lot, Crandall was ahead, Hocum following him, and the prisoner following Hocum. Crandall got nearly to the road, and some 30 or 40 feet below where Tiffany and Hocum were, when he heard Tiffany say, " Hurry up, get there damn you, or I will hurry you with a bullet;" and Hocum then turned around and replied, " You have got to give me a reasonable time to get out, and if you want to shoot, why shoot;" and Tiffany got up close enough and slapped him once or twice in the face, with his fist or his flat hand, and he threw his hand up to ward the blow off. Then Crandall started back towards them, and when he came within six or ten feet of Tiffany, he hauled out a revolver and shot, and Hocum fell. And Crandall then seized Tiffany by the right wrist and by the neck and brought him to the ground. Tiffany said to him, " Let me up, I wont shoot you," and Crandall said to him, " Give up your revolver," and Tiffany replied, " I will never do it." Crandall then choked him until he gave it up, and then got off from him and went to Hocum, and turned him over to see how badly he was hurt, and he only gasped twice, and Tiffany was then running towards the orchard, by a downward course, towards the road. This is substantially the evidence of Lafayette Crandall, in chief, as to the circumstances attending and illustrating this homicide. It is the evidence of the only witness on the part of the commonwealth, who was present or very near the place or scene of the homicide. In the cross-exami-

Charge of Court below.

nation of Crandall, there may be some modifications of this statement, but not in any very material matters. I have selected this witness, Crandall, and his evidence, as affording the most complete exposition of the case as claimed by the commonwealth.

The version of the defence, as presented in the evidence of the prisoner, is briefly and substantially this: Tiffany, on the afternoon of the fatal occurrence, went to his own lot to pick berries, and while there, engaged in picking berries, Crandall and Hocum came where he was and said to him "How do you do." He replied to them, pleasantly, "How do you do," and noticed that they had been drinking. Hocum said to him, "Why don't you let Steve alone? Why do you meddle with his distillery?" To this the prisoner replied "That is my business" and Hocum said "We will make it ours, and if you don't stop informing against him we will fix you in a way that you will wish you never had." That Tiffany said in reply "Gentlemen, get off from my premises, I will not be abused on my land. You shall not pick berries here." And Crandall said "Lick him, Sam, you can do it without my help, and I will go and sit down and see the fun." And Crandall then started away, slowly, and Hocum called the prisoner names, and used hard language; that the prisoner told the deceased to get off, and that the deceased put his hand in the prisoner's face, and then the prisoner told him that he didn't want any quarrel, that he had never struck a man in his life; that the deceased then struck the prisoner on the stomach and on the right cheek; that the prisoner requested to be let alone; that he told the deceased that if he wanted to quarrel he could have his drunken quarrels with his son-in-law, as he did the other night, when he got his face marked; that the deceased picked up a stone and struck the prisoner on the left side, stunning him; that the deceased then, with a stone in his hand, said "I will smash your brains out, you son of a bitch," and at that moment the prisoner saw Crandall running towards him, with his fist doubled up; that the prisoner was frightened and called "Help;" that Hocum said, "I will help you with a bullet," and Crandall said, "Shoot him, Sam, shoot him;" that Hocum, with a stone in one hand, put his other hand towards his hip pocket and stepped towards the prisoner; that

the prisoner, having heard that Crandall and the deceased were desperate characters and quarreled among themselves and threatened to shoot each other, and threatened to kill each other, suddenly thought of his revolver that he had in his pocket, and jerked it out, and was so excited and scared that he could hardly realize when the revolver went off and killed Hocum; that just then Crandall caught hold of him, and jerked him down, and placed one hand upon the prisoner's throat, and the other on the revolver; that then the prisoner heard a voice saying, "Keep the revolver, Lafe," and that Crandall then let the prisoner go, and he got away, and that he can hardly tell how he got home.

Now, in the evidence of these two witnesses the leading features of the case as claimed by the commonwealth, and the case as claimed by the prisoner, are presented. I shall not stop at this time to refer to the other evidence in the cause bearing upon these respective statements, corroborating either. I have deemed it proper to call your attention to these distinguishing salient features of the case, as claimed by each side, preliminary to the instructions which I will now give you as to the law of the case; and after that I shall take occasion to call your attention to some other evidence in the cause as it bears upon this issue.

Under the indictment upon which this issue is joined, the prisoner at the bar may be acquitted of all crime; he may be convicted of voluntary manslaughter, he may be convicted of murder in the second degree, or he may be convicted of murder in the first degree. So that it becomes necessary for the court to instruct you fully as to the law respecting the degrees of murder, as to the law of voluntary manslaughter, and as to the law of self defence; and this we will now proceed to do. . . . .

Insulting or scandalous words are not sufficient cause of provocation, nor are actual indignities to the person, of a light and trivial kind. Whenever the act evidences a deadly revenge, and not the mere heat of blood; whenever it is the result of a devilish disposition, and not merely the frenzy of rage, it is not manslaughter, but murder. To excuse homicide by the plea of self defence, it must appear that the slayer had no other possible, or at least probable, means of escaping, and

that his act was one of necessity. The act of the slayer must be such as is necessary to protect a person from death or great bodily harm, and must not be entirely disproportionate to the assault made upon him. If the slayer use a deadly weapon, and under such circumstances as the slayer must be aware that death will be likely to ensue, the necessity must be great, and must arise from imminent peril of life or great bodily injury. If there be nothing in the circumstances indicating to the slayer, at the time of his act, that his assailant is about to take his life, or to do him great bodily harm, but his object appears to be only to commit an ordinary assault and battery, it will not excuse a man of equal, or nearly equal strength in taking his assailant's life with a deadly weapon. In such cases it requires a great disparity of size and strength on the part of the slayer, and a very violent assault on the part of his assailant to excuse him. The disparity, on the one hand, and the violence on the other, must be such as convinces the jury that great bodily harm, if not death, would follow, unless the slayer had thus defended himself, or that the slayer had reasonable ground to think it would be so. The burden lies upon the prisoner in such a case, of proving that there was an actual necessity for taking life, or a seeming one, so reasonably apparent and convincing to him as to lead him to believe he could only defend himself in that way. This principle and right of self defense applies although it should afterwards appear that the apprehended imminent danger was not actual. When one who is without fault is attacked by another in such a manner, or under such circumstances, as to furnish reasonable ground for apprehending a design to take away his life or do him great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, he may safely act upon appearances and kill his assailant, if that be necessary to avoid the apprehended danger, and the killing will be excusable, although it may afterwards turn out that the appearances were false and that there was in fact neither a design to do him serious injury, nor danger that it would be done. It is the reasonable apprehension of imminent danger to life, or of great bodily harm, based upon the appearances existing at the time, that the law regards as sufficient, when acted upon, to excuse a homicide. . . . . .

Charge of Court below.

It is a general rule that all homicide is presumed to be malicious, that is, murder of some degree, until the contrary appears in the evidence.   Therefore, the burden of reducing the crime of murder to manslaughter, where it is proved that the prisoner committed the deed, lies on him.   He must show all the circumstances of alleviation or excuse, upon which he relies to reduce his offence from murder to a milder form of homicide, unless the facts already in evidence show it.   But though the homicide without circumstances of alleviation or excuse is presumed to be murder, it is not presumed to be murder of the first degree.   The presumption against him rises no higher than murder in the second degree, until it is shown by the commonwealth to be murder in the first degree. It therefore lies on the commonwealth to satisfy the jury of those facts and circumstances which indicate a deliberate intention to kill, and the cool depravity of heart and conscious purpose which constitute, as before stated, the crime of murder in the first degree. . . . . In deciding upon the case or any material part of it, it is the duty of the jury to give the prisoner the benefit of any reasonable doubt arising out of the evidence, which prevents them from coming to a satisfactory conclusion.   But this doubt must fairly arise out of the evidence, and not be merely fancied, or conjured up.   The jury must not raise a mere fanciful doubt, to escape the consequences of an unpleasant verdict.   It must be an honest doubt, such a difficulty as to fairly strike a conscientious mind and cloud the judgment.   [If there be a reasonable doubt that any offence has been committed by the prisoner, it operates to acquit.   But if the evidence clearly establishes the killing by the prisoner, purposely, with a deadly weapon, an illegal homicide of some kind is established, and the burden then lies upon the prisoner to show that it was excusable, or an act of self defence.] [4]   In connection with these general instructions I will read to you the points submitted in behalf of the prisoner, and answer them.

The counsel for the prisoner have asked us to charge you:

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

4. To convict of murder in the second degree, the jury must be satisfied beyond all reasonable doubt of the absence of a sudden quarrel, from sufficient provocation, and done in the heat of passion, and of the presence of malice aforethought.

Answer: This point is refused.[1]

12. That in order to convict of murder in the second degree the jury must be satisfied beyond a reasonable doubt that the killing was with malice aforethought, to wit, either express or implied, which is defined to be from a wicked and depraved heart, regardless of all social law, and not from a sudden quarrel, from sufficient provocation; and this is not to be implied in this case, where the facts and circumstances are in evidence, and the prisoner bears marks of violence upon his body, but it is to be proven that such malice aforethought actually existed, beyond all reasonable doubt, before they can even convict of murder in the second degree.

Answer: This point is refused.[2]

16. That the jury must take into consideration the place where the difficulty occurred, that it was on the prisoner's land, and he had the superior right; that he had a right to order the deceased off, and if he resisted, or hesitated, or struck the prisoner, he had a right to oppose it by force, and to follow him up until an attack was made upon him so fierce as to put him on self defence, and then if the attack which endangered seriously his life, or great bodily harm, or reasonably appeared so, was so sudden and fierce that by attempting to retreat he might lose his advantage of self defence, or place him in more danger, or that it reasonably appeared so from the facts, he had a right to stand on his defence at once, and shoot his assailant, and could not be convicted of any offence, but must be acquitted.

Answer: It is true that the prisoner was upon his own land. It is true, so far as this evidence discloses the situation, that he had the superior right there. But I am not prepared to say that he would be acquitted of all crime upon the facts or state of things or conduct described in this point.[5]

\*     \*     \*     \*.     \*     \*     \*     \*     \*     \*

[You observed, gentlemen, that I refused to affirm two of the prisoner's points, with reference to the crime of murder in the second degree. I refuse to say, as requested in those points, that if the circumstances in evidence, put there either by the commonwealth or the prisoner, raised a reasonable doubt of that crime, that those facts and circumstances would operate to acquit of it. And perhaps, that you may clearly

understand the position taken, we should explain again here, how the law is upon this subject. As we have already said to you in the general instructions, where a homicide is committed, and an unlawful killing is shown, it is presumed by law to be murder. But under our statute that presumption rises no higher than murder in the second degree. To convict of murder in the first degree the burden is upon the commonwealth, all the time, to show beyond a reasonable doubt that that crime was committed. Not so the second degree, in the case and under the circumstances stated. The law presumes, upon those facts, that offence, and then the burden is upon the prisoner to reduce the crime from murder in the second degree to a milder form of homicide—to voluntary manslaughter, unless those facts and circumstances appear in the evidence of the commonwealth. If the facts and circumstances are in evidence, no matter by whom produced, which make the extenuation that reduces it, they have the effect to reduce it; but those facts and circumstances must be more than sufficient to raise a reasonable doubt.][3] . . . . .

The jury returned a verdict that the defendant was guilty of murder in the second degree. On March 7, 1887, a rule to show cause why a new trial should not be granted was discharged, and on the same day the defendant was sentenced to undergo an imprisonment by separate or solitary confinement in the penitentiary for the Eastern District of Pennsylvania for the term of eight years from the date of sentence; thereupon he took this writ. On April 1, 1887, this court, on application made, directed that the defendant be admitted to bail in the sum of $8,000, whereupon he was released from custody. The errors assigned on the argument of the writ of error were, inter alia:

1. The answer to defendant's 4th point.[1]
2. The answer to defendant's 12th point.[2]
3. The part of the charge embraced in [ ][3]
4. The part of the charge embraced in [ ][4]
5. The answer to defendant's 16th point.[5]
6. The refusal of defendant's offer.[6]

*Mr. E. L. Blakeslee* (with him *Mr. A. H. McCollum* and *Mr. Geo. A. Post*), for the plaintiff in error:

The first, second, third and fourth assignments of error raise this proposition, to wit: That when a killing by a deadly weapon is shown, and there is evidence of self defence and provocation, the jury cannot convict of murder in the second degree, unless they believe from the whole evidence, beyond a reasonable doubt, that the defendant is guilty of this offence. We claim that the undoubted weight of authority is, that the defendant cannot be convicted unless proven guilty beyond a reasonable doubt, not only of killing, but of the malice aforethought, arising from the whole evidence, both that adduced by the Commonwealth, and that adduced in the defence.

1. The doctrine that malice was a presumption of law from the act of killing, had its origin in a barbarous age. Lord Holt lays down this ancient law in Regina v. Mawbridge, Kelyng 122, to wit: "If a man was found to be slain, it was always intended, (1) that he was a Frenchman; (2) that he was killed by an Englishman; (3) that the killing was murder; (4) if any one was apprehended to be the murderer, he was to be tried by fire and water, though he killed him by misfortune; which was extended beyond reason and justice in favor of the Normans." At all events, the doctrine of the presumption of malice, was confined to cases of secret homicide, and does not apply to those cases where the facts and circumstances are proved, and the existence of malice from the whole evidence left in doubt.

2. The leading case in this country, determined by a divided court, is Commonwealth v. York, 9 Metc. 93. The opinion of a majority of the court, by SHAW, C. J., established: (1) Where the killing is proved with a deadly weapon, and nothing further is shown, the presumption of law is, that it was malicious. (2) The burden is then upon the defendant to show excuse or extenuation. (3) His guilt or innocence depends upon the preponderance of evidence. The doctrine of Commonwealth v. York, has been much questioned. "Generally there are attendant circumstances, e. g., the place, the character of the attack, the relative position or strength of the parties, etc., from which some inference may be logically drawn by the jury, as to whether the accused did or did not commit the homicide with felonious intent; and when such circumstances are proved in the case, the presumption of felonious intent,

if indeed there is such a presumption, disappears, and the whole question of felonious intent lies open to the jury, who must be satisfied beyond a reasonable doubt from all the facts of the case that the homicide was with such intent before they can legally convict the accused: " 3 Greenl. Ev. 14th ed., 140, n. a; 1 Bennett & H., L. C., 360; Wharton on Cr. Ev. 738; 2 Bish. Cr. Proc. 620.

3. The burden of proof never shifts to the defendant in a criminal prosecution, even when the commonwealth has made out a prima facie case :   Commonwealth v. McKie, 1 Gray 64; s. c., 1 Bennett & H. L. C., 347, n.; Chaffee v. United States, 18 Wall. 544; Lillienthal v. United States, 97 U. S. 237; Commonwealth v. Eddy, 7 Gray 584; Cent. Bridge Co. v. Fuller, 2 Gray 131; 1 Bish. Cr. Proc. 1049, 1057; United States v. Gooding, 12 Wheat. 460; Crowninshield v. Crowninshield, 2 Gray 524; Commonwealth v. Daley, 4 Gray 209; Wharton Cr. Ev. 330, 336; Commonwealth v. Hawkins, 69 Mass. 463; Maher v. People, 10 Mich. 212.   And in Turner v. Commonwealth, 86 Pa. 74, the present CHIEF JUSTICE said: " We are inclined to think with Mr. Greenleaf, 1 Greenl. Ev. § 81 b, that the true rule in criminal cases, notwithstanding some decisions to the contrary, is, that the burden of proof never shifts, but rests upon the commonwealth throughout; so that in all cases, a conviction can be had only after the jury have been convinced, beyond a reasonable doubt of the defendant's guilt.   From this it results that if from any, or from all the evidence taken together, a reasonable doubt of the defendant's guilt is raised, there should be an acquittal."

4. The exact point raised by the fifth assignment of error is this : Defendant claimed he had a right to order a man off his premises, and, if he resisted he had a right to use sufficient force to put him off, unless it came to a question of life; and then we admitted he must retreat, unless suddenly attacked in such manner as to endanger his life, and that he then might shoot to protect his life.   One has a right to put a man off his land, using proper force if he refuses to go, but he must retreat before taking life, if he can, and can only justify killing his assailant on the ordinary grounds of self-defence.   That the owner has the right to eject a trespasser from his land, has never been questioned: Scribner v. Beach, 4 Den. 450;

Weaver v. Bush, 8 Term R. 78; Commonwealth v. Clark, 2 Metc. 25; 1 Waterman on Trespass 151; Harrigan & T., Self-Defence, 900, n: "He may by the doctrine of these and all the cases where the rule is stated, use within a certain prescribed limit as much force as is necessary to preserve his possession. The limit spoken of, is the limit at which it becomes necessary to take life." We submitted the point to fit the case at bar, and to show that the defendant was in the exercise of his legal rights in ordering Hocum off and in going down six rods on his own land to compel him to leave.

5. That the character of Crandall, the co-assailant, as a quarrelsome, dangerous fellow, was bad, and so known to the defendant at the time of the shooting, we have no doubt was admissible. The law is well settled that where self-defence is shown, the quarrelsome and dangerous character of the deceased, or the assailants, may be shown: Alexander v. Commonwealth, 105 Pa. 1; Abernethy v. Commonwealth, 101 Pa. 326; Pennsylvania v. Robertson, Add. 249. Will it be pretended that if three men attack A, and A shoot one in self-defence, he cannot show the character of any or of each of his assailants?

*Mr. F. L. Lott, District Attorney,* (with whom was *Mr. Cornelius Smith*), for the defendant in error:

1. The principle adopted by the court below is as old as the common law, and well settled by the highest authority of the state. It was clearly defined in Commonwealth v. Drum, 58 Pa. 18: "At first it may be stated, as a general rule, that all homicide is presumed to be malicious, until the contrary appears in the evidence. Therefore, the burthen of reducing the crime from murder to manslaughter, where it is proved that the prisoner committed the deed, lies on him. He must show all the circumstances of alleviation or excuse upon which he relies to reduce his offence from murder to a milder kind of homicide, unless, indeed, when the facts already in evidence show it." The identical doctrine was followed in O'Mara v. Commonwealth, 75 Pa. 429.

2. To affirm the point covered by the fifth assignment of error would be to establish the rule that the owner of land may order a stranger off, and if the stranger, without refusing

but intending to go, pauses to take a breath, hesitates an instant preparatory to leaving, the owner may pounce upon him, commit a breach of the peace, and follow it up by force until he is in danger of bodily harm, " or reasonably appeared so," and if, by attempting to retreat it might put him in more danger, or reasonably appeared so, he of right might take the stranger's life. He who commands another to leave his land, must give that other a reasonable time to leave.

3. As to the sixth assignment of error. The general rule is, that the character as to quarrelsomeness of the deceased in a homicide case cannot be proven: Abernethy v. Commonwealth, 101 Pa. 329. It is permitted only in particular cases and under certain circumstances. The only ground on which the character of Crandall could have been proven, is on the theory that Tiffany would have been justified had he killed Crandall. But the conduct of Crandall, as described by the defendant himself, in his testimony, would hardly have justified a simple assault, much less the taking of his life.

OPINION, MR. JUSTICE STERRETT:

The clear and comprehensive charge of the learned president of the Oyer and Terminer contains a correct exposition of the law applicable to the several degrees of homicide upon which the jury were required to pass, except in his refusal to charge, substantially as requested by the prisoner, that a reasonable doubt as to the existence of malice was sufficient to reduce the grade of homicide below murder of the second degree. His refusal to so instruct the jury, is practically the subject of complaint in the first four specifications of error.

While it was not denied that the deceased, Samuel Hocum, died from the effect of a pistol shot wound inflicted by the prisoner, it was contended that the shooting was done in justifiable self-defence, or, at the very utmost, under such legal provocation as stripped the act of malice and reduced the grade of offence to manslaughter. Considerable evidence was introduced for the purpose of showing that the prisoner was assaulted on his own premises by deceased and his companion Lafayette Crandall; that the attack was so fierce and violent as to warrant him in believing he was in danger of great bodily harm or loss of life unless he used the pistol in defending

himself. Without referring fully to the evidence, it is suffi-
cient to say that it tended to sustain his contention, and pre-
sented a proper case for submission to the jury on questions of
fact involved therein.

Among other things, the prisoner himself testified : " I went
to my lot to pick berries, . . . . . . and while I was there, busy
picking berries, Crandall and Hocum came where I was, and I
said, ' How do you do,' pleasantly, and they responded, and I
saw they had been drinking. Hocum said, ' Why don't you let
Steve alone ? Why do you meddle with his distillery ? ' And
I said, ' That is my business ; ' and Hocum said, ' We'll make
it ours. If you don't stop informing against him we'll fix you
in a way that you will wish you never had.' I' said, ' Gentle-
men, get off from my premises. I will not be abused· on my
own land. You shall not pick berries here.' And Crandall
said, ' Lick him, Sam. You can do it without any help. I
will go and sit down and see the fun.' And Crandall started
away slowly and Hocum called me names."

Q. What did he call you ? A. He called me a liar. He
said I was a liar.

Q. What else ? A. Well, he used some hard language. I
would not be able to tell exactly, perhaps. I told him to go
off, and at that he stuck his hand in my face. I stepped away.
We walked slowly down the hill. He halted to stick his hands
in my face. I told him I didn't want any quarrel, that I had
never struck a man in my life. Then he struck me in the
stomach and on the right cheek. I told him to let me alone.
If he wanted to quarrel he could have his drunken quarrels
with his son-in-law, as he had the other night, when he got his
face marked. He picked up a stone and struck me in the left
side, stunning me. He had another stone, and says, ' I will
smash your brains out, you son of a bitch ; ' and just then I
saw Crandall running. He throwed his pail, and was running
with all his might, with his fist doubled up, straight towards
me, and I was scared, and I hallooed, ' Help,' and Hocum said,
' I will help you with a bullet ; ' and Crandall says, ' Shoot
him, Sam, shoot him.' Hocum had a stone in his hand and
put his other hand toward his hip pocket, and stepped towards
me. I had heard that they were desperate characters, and
quarreled among themselves, and threatened to shoot each

other, and threatened to kill each other, and I suddenly thought of my revolver and I jerked it out, and I was so excited and scared that I hardly realized when the revolver went off. Just then Crandall had hold of me and jerked me down, and had one hand on my throat and the other on the revolver, and then I heard a voice say, ' Keep the revolver, Lafe,' and he let go of my hand and I got away. I can hardly tell how I got home," etc.

The prisoner's narrative of the occurrence bears the impress of candor and truthfulness; and, while it is contradicted in some essential particulars by Crandall and other witnesses for the commonwealth, it is corroborated to some extent by other evidence showing his condition after the shooting, great prostration, marks of blows on his face and left side where he testified he was struck by Hocum, etc. These and other corroborating facts and circumstances had an important bearing on the question of veracity between him and witnesses for the commonwealth.

In view of the evidence relied on by the prisoner, the court was requested to charge as to the legal effect of the facts the jury might find therefrom, and, especially, of a reasonable doubt as to the existence of malice at the time the fatal shot was fired. In that portion of his charge recited in the third specification, the learned judge, after reminding the jury that he had " refused to affirm two of the prisoner's points with reference to the crime of murder in the second degree," said, " I refuse to say, as requested in those points, that if the circumstances in evidence, put there either by the prisoner or the commonwealth, raised a reasonable doubt of that crime, that those facts and circumstances would operate to acquit of it." Again: " If the facts and circumstances are in evidence, no matter by whom produced, which make the extenuation that reduces it (grade of the crime), they have the effect to reduce it, but those facts and circumstances must be more than sufficient to raise a reasonable doubt." This was misleading and erroneous; and the error is not cured by what he said in immediate connection with the first quoted sentence.

It is undoubtedly true that " where a homicide is committed and the killing is shown to be unlawful, it is presumed to be murder," but this presumption may be rebutted, or so far

weakened by other evidence in connection with the legal presumption of innocence as to create a reasonable, substantial doubt as to the guilt of the accused or the grade of the crime charged, and thus entitle him to acquittal or reduction of the grade. In other words, it is not a presumption juris et de jure—an irrebuttable presumption. Malice, for example, is an essential ingredient of murder, either of the first or second degree; and while its existence may be presumed from certain proved or admitted facts, the presumption is not necessarily conclusive. There may be rebutting evidence for the consideration of the jury. It is incumbent on the commonwealth, in every such case, to establish the existence of malice, express or implied, not merely by a preponderance of evidence but by proof beyond a reasonable doubt. In Turner v. Commonwealth, 86 Pa. 54, 74, the present CHIEF JUSTICE said: "We are inclined to think with Mr. Greenleaf, 1 Greenl. Ev. § 81 b, that the true rule in criminal cases, notwithstanding some decisions to the contrary, is that the burden of proof never shifts but rests on the prosecution throughout, so that in all cases a conviction can be had only after the jury have been convinced, beyond a reasonable doubt, of the defendant's guilt. From this, it results that if from any, or from all the evidence taken together, a reasonable doubt of defendant's guilt is raised, there should be an acquittal."

Whatever doubt there may be as to the applicability of the principle thus stated, to cases where the prisoner relies on some distinct, substantive ground of defence, not necessarily connected with the transaction on which the indictment is founded, such as insanity, etc., there can be no question as to its soundness as well as applicability to cases where, instead of setting up such separate and independent fact in answer to a criminal charge, the accused confines his defence to the original transaction charged as criminal, with its accompanying circumstances. In the latter the burden of proof never changes, but remains on the commonwealth to satisfy the jury that the act was unlawful and unjustifiable, and, if the crime be a graded one, that it is of the grade claimed by the commonwealth.

Numerous authorities might be cited in support of this view, among which are Wharton's Cr. Ev. 236 ; Commonwealth v.

Hawkins, 69 Mass. 463 ; Maher v. People, 10 Mich. 212 ; Lillienthal v. United States, 97 U. S. 266. In the latter it is said : " In criminal cases the true rule is that the burden of proof never shifts ; that, in all cases, before a conviction can be had the jury must be satisfied from the evidence, beyond a reasonable doubt, of the affirmative of the issue presented in the accusation, that the defendant is guilty in manner and form as charged in the indictment." " Where the matter of excuse or justification of the offence charged, grows out of the original transaction, the defendant is not driven to the necessity of establishing the matter in excuse or justification by a preponderance of evidence, and much less beyond a reasonable doubt. If, upon a consideration of all the evidence, there be a reasonable doubt of the guilt of the party, the jury are to give him the benefit of such doubt : " Tweedy v. State, 5 Ia. 433. The same thought is thus presented by Mr. Wharton in his admirable work on Evidence, above referred to : " Provocation, also, as a defence, which goes to negative premeditation and malice, must be regarded as traversing the essential ingredients of all offences which require proof of premeditation and malice. Hence, according to the distinction just stated, the burden is on the defendant to prove provocation in all cases where he opens this defence ; yet, when the evidence on both sides is closed, he is entitled to an acquittal if he has offered proof enough to cast a reasonable doubt on the averments of malice and premeditation, when thus essential."

The fifth specification is not sustained. As a whole the point recited therein is not correct as a legal proposition, and hence there was no error in refusing to affirm it. While the prisoner had a right to order deceased and his companion off the premises, etc., he had no right to follow them " up until an attack was made upon him so fierce as to put him on self-defence."

The subject of complaint in the sixth specification is the rejection of the offer to prove by the witness then on the stand, and twenty-five other witnesses, " that Lafayette Crandall has a notoriously bad reputation, as to being a quarrelsome, bad-tempered, dangerous man, and that all this was known to Judson Tiffany on the 15th July, 1886, at the time of the shooting." For obvious reasons that evidence should have been received.

According to defendant's own evidence, as we have seen, he was assaulted by both Hocum and Crandall, and he had as much right to prove the bad reputation of the latter as a violent and dangerous man, as he would have had to prove the reputation of Hocum. It had a direct bearing on the question of justifiable self-defence.

The remaining specifications are not sustained. There is nothing in either of them that calls for special notice.

> Judgment reversed, and a venire facias de novo awarded.