Commonwealth *v.* Ewing, Appellant.

Submitted January 5, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Murray B. Frazee, Jr.,* Public Defender, for appellant.

*Ronald J. Hagarman,* Special Assistant District Attorney, for Commonwealth, appellee.

OPINION BY MR. CHIEF JUSTICE BELL, April 22, 1970:

On April 26, 1965, while represented by counsel, appellant Curtis Ewing pleaded guilty to the murder of his wife, Cleo. A degree-of-guilt hearing was held in the Court of Oyer and Terminer of Adams County. Appellant was found guilty of murder in the first degree

and sentenced to life imprisonment. No appeal was taken.

After a Court hearing on November 6, 1968, pursuant to the Post Conviction Hearing Act, the Court, on April 18, 1969, concluding that the defendant had not knowingly waived his right to appeal from the original judgment and sentence, granted him leave to file an appeal nunc pro tunc. The sole issue presented in this appeal* is whether the Commonwealth presented sufficient evidence at the degree-of-guilt hearing to raise the degree of guilt and justify a finding of murder in the first degree.

Appellant admits that he killed his wife but contends (a) that he did not intend to kill her, but only to frighten or wound her, and (b) that the Commonwealth has not met its burden of showing the specific intent which is required for conviction of murder in the first degree. We disagree.

We believe it will help answer appellant's contentions if we first state the pertinent principles of law before reviewing and analyzing the evidence.

In *Commonwealth ex rel. Andrews v. Russell*, 420 Pa. 4, 215 A. 2d 857, this Court said (page 6) : "A plea of guilty to an indictment for murder constitutes an admission or confession of guilt of the crime of murder, with the degree of murder to be determined and fixed by the Court. A defendant cannot plead guilty to murder either of the first degree or of the second de-

---

* Appellant's prior claim that his guilty plea was involuntary, based on assertions of coerced confessions and ineffective assistance of counsel, was dismissed below after a hearing at which appellant was represented by counsel. As this issue is not presented by appellant in this counselled appeal, it must be deemed waived under Section 4 of the Post Conviction Hearing Act, 1966, January 25, P. L. (1965) 1580, §4, effective March 1, 1966, 19 P.S. 1180-4 (1969 Supp.). *Commonwealth v. Black*, 433 Pa. 150, 249 A. 2d 561; *Commonwealth ex rel. Linde v. Maroney*, 432 Pa. 324, 248 A. 2d 235; *Commonwealth v. Satchell*, 430 Pa. 443, 243 A. 2d 381.

gree, but must plead guilty to murder generally. However, under the decisions of this Court, a plea of guilty to an indictment for murder constitutes or amounts to an admission of the crime of murder in at least the second degree, and therefore the burden is upon the Commonwealth, if it believes the crime amounted to murder in the first degree, to produce testimony legally sufficient to raise the crime to first degree. Commonwealth v. Kurus, 371 Pa. 633, 637, 92 A. 2d 196; Commonwealth v. Samuel Jones, 355 Pa. 522, 525, 50 A. 2d 317."

As this Court said in *Commonwealth v. Commander*, 436 Pa. 532, 260 A. 2d 773 (page 538): "In Commonwealth v. Finnie, 415 Pa., supra, we said (pages 171-172): ' "In Commonwealth v. Tyrrell, 405 Pa. 210, 174 A. 2d 852, the Court said (pages 212-213): 'The essential difference in a nonfelony murder-killing between murder in the first degree and murder in the second degree is that murder in the first degree requires a specific intent to take the life of another human being: Commonwealth v. Ballem, 386 Pa. 20, 123 A. 2d 728; Commonwealth v. Dorazio, 365 Pa., supra; Commonwealth v. Malone, 354 Pa., supra; Commonwealth v. Chapman, 359 Pa. 164, 58 A. 2d 433; Commonwealth v. Jones, 355 Pa. 522, 50 A. 2d 317; Commonwealth v. Iacobino, 319 Pa. 65, 178 A. 823.'

" ' "The specific intent to kill which is necessary to constitute in a nonfelony murder, murder in the first degree, may be found from a defendant's words or conduct or from the attendant circumstances together with all reasonable inferences therefrom, *and may be inferred from the intentional use of a deadly weapon on a vital part of the body of another human being*:[*] Commonwealth v. Tyrrell, 405 Pa., supra; Commonwealth v. Moore, 398 Pa. 198, 157 A. 2d 65; Commonwealth

---

[*] Italics in *Commonwealth v. Commander* Opinion.

v. Nelson, 398 Pa. 359, 152 A. 2d 913; Commonwealth v. Ballem, 386 Pa. 20, 123 A. 2d 728; Commonwealth v. Heller, 369 Pa. 457, 87 A. 2d 287; Commonwealth v. Jones, 355 Pa. 522, 50 A. 2d 317." ' "

Furthermore, this Court has consistently held that the use of a *gun* on a vital part of the deceased's body *raises the presumption* that the defendant shot with the intent to kill the deceased. *Commonwealth v. Gidaro,* 363 Pa. 472, 70 A. 2d 359; *Commonwealth v. Chapman,* 359 Pa. 164, 58 A. 2d 433; *Commonwealth v. Scott,* 284 Pa. 159, 130 Atl. 317. However, the inference or presumption that arises from the intentional use of a deadly weapon on the vital part of the body of another human being is merely a factual presumption. In the absence of any other evidence as to the defendant's intent, it is sufficient to sustain a finding of murder in the first degree. When evidence is introduced to overcome or rebut this presumption, the question of defendant's intent becomes one for the triers of fact. The triers of fact may, however, consider the presumption along with all other credible evidence presented on the issue of intent. *Commonwealth v. Gibbs,* 366 Pa. 182, 76 A. 2d 608; *Commonwealth v. Gidaro,* 363 Pa., supra; *Commonwealth v. Wucherer,* 351 Pa. 305, 41 A. 2d 574; *Commonwealth v. Kluska,* 333 Pa. 65, 3 A. 2d 398; *Commonwealth v. Troup,* 302 Pa. 246, 153 Atl. 337; *Commonwealth v. Green,* 294 Pa. 573, 144 Atl. 743; *Tiffany v. Commonwealth,* 121 Pa. 165, 15 Atl. 462.

Defendant's assertion that he did not intend to kill his wife made the issue of intent a question of fact for the three-Judge Court. Appellant presented merely slight self-serving testimony of his intention merely to frighten or to wound her, while the evidence to the contrary was overwhelming.

In *Commonwealth v. Commander,* 436 Pa., supra, this Court, quoting from *Commonwealth v. Frye,* 433 Pa. 473, 252 A. 2d 580, said (page 538) : " 'It is horn-

book law that the test of the sufficiency of the evidence—irrespective of whether it is direct or circumstantial, or both—is whether, accepting as true all the evidence and all reasonable inferences therefrom, upon which if believed the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes of which he has been convicted. [citing cases].' "

As the Court said in *Commonwealth v. Kirkland,* 413 Pa. 48, 195 A. 2d 338 (page 58) : ". . . [I]t is well settled that a jury or a trial Court can believe all or a part of or none of a defendant's statements, confessions or testimony, or the testimony of any witness: Commonwealth v. Melton, 406 Pa. 343, 178 A. 2d 728; Commonwealth v. Tyrrell, 405 Pa. 210, 174 A. 2d 852; Commonwealth v. Ballem, 386 Pa. 20, 123 A. 2d 728; Commonwealth v. Donough, 377 Pa. 46, 50, 103 A. 2d 694; Commonwealth v. Homeyer, 373 Pa. 150, 153, 94 A. 2d 743; Commonwealth v. Phillips, 372 Pa. 223, 93 A. 2d 455." Accord: *Commonwealth v. Winebrenner,* 439 Pa. 73, 265 A. 2d 108.

In the light of the above authorities, we shall review and analyze the evidence.

Ewing had separated from his wife and was living nearby in Waynesboro, Pennsylvania. According to his statement given to the police and corroborated by a witness, he spent the evening of October 21, 1964, in Waynesboro, drinking beer and watching television in two local taverns. The distrust of his wife's fidelity which had caused their separation apparently continued to bother him. Later that night he decided to drive back to the Ewing home to see if Mrs. Ewing was entertaining another man there. He drove by the darkened house, parked his car some distance away and walked across a field and up to the house. Unable to sneak into the unlighted house, appellant broke in through a locked

screen-door. Hearing this, appellant's wife ran from the house to the home of the next-door neighbors, Mr. and Mrs. Schultz.

Appellant then went to his wife's bedroom to see if anyone had been there with her. He saw no one else in the bedroom, but in a closet which had been left open he saw the .303 Enfield rifle his wife had given him for his birthday some four years before. He took the rifle from the closet, loaded three shells into it and left the house, heading for the Schultz house.

By this time, Mrs. Ewing had awakened Mr. and Mrs. Schultz, who let her into their home. Mrs. Ewing told them that her husband was after her and that she was afraid he might kill her. Mr. Schultz called the State Police on the kitchen phone and then handed the phone to Mrs. Ewing when the police answered. Appellant meanwhile had crossed the yard between his home and the Schultz's. He saw the light in the kitchen where Mrs. Ewing was using the phone, but the kitchen window was too high for him to see through. He stepped back across the lawn to a point where he could see his wife's head above the windowsill. Appellant then raised his hunting rifle to his shoulder and, when he could see his wife's head outlined in the scope, fired a single shot into her head behind her ear. The entire back of Mrs. Ewing's head was blown off and her death was undoubtedly instantaneous. Appellant then drove back to Waynesboro as Mr. Schultz calmed his wife and called the police.

When the police learned of the shooting, they went to Ewing's apartment in Waynesboro. Finding him there, they took him first to the Waynesboro Police Department and then to the Gettysburg Police Substation. There appellant confessed to the murder of his wife. After confessing, appellant took the police to the driving range near his home, where he had thrown

the murder weapon. After identifying the gun, he re-enacted the crime for the police.

In addition to the facts hereinabove set forth, [Trooper] Eckenrode testified at the degree-of-guilt hearing that while appellant was reenacting the crime he asked the appellant what he had in mind when he took the gun from the closet and loaded it, and that Ewing then said, "I had it in my mind to shoot her." Eckenrode further testified that he asked Ewing, "Well, then, when did it formulate in your mind, when were you going to kill her?" and that Ewing replied, "I picked up the gun and tucked it under my left arm and I picked up three shells out of the box and put them into the chamber, and at this point is when I decided I was going to kill her."

Appellant also described to Eckenrode what happened after he had gotten into position to see his wife in the Schultz's kitchen. Eckenrode testified that Ewing said: "I raised the gun to my shoulder, got her in the sights, and I pulled the trigger."

Appellant was cross-examined by the district attorney as to the nature of his intention that night. He maintained throughout the hearing that he was confused and did not know what his intention had been. The ridiculousness of this position and contention is further apparent from the following responses to the district attorney's questions: "Q. Can you explain to me why you went over there with a gun, with three shells in the chambers or in the gun, if you weren't angry? A. I can't give you a definite explanation, no. Q. Do you remember doing what Corporal Eckenrode said you did, you backed off the window to get a view of her? A. Yes. Q. Do you remember sighting along the rifle at her? A. Yes, I remember that. Q. Through the window. Do you remember what you intended in your mind, at that point? Were you angry? A. I suppose my intentions were then to shot [sic] at

her. Q. Were you going to shoot at her or did you intend to kill her then? A. That I couldn't say. Q. Well, did you take good aim on her? A. Well, as good as I could. Q. Corporal Eckenrode apparently said you had a right profile view of her, did you get that in the sights? A. Yes. Q. Do you remember squeezing the trigger? A. Yes. Q. And as a matter of fact at that point you did intend to shoot her, didn't you? A. I suppose I must have. Q. As you remember, did you? A. I don't know what was in my mind at that time. Q. You don't remember, is that right? A. No."

The evidence to justify the verdict of first degree murder was overwhelming.

Judgment of sentence affirmed.