EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ANTONIO CASTRO PÉREZ, acusado y apelante.

Núm. 13597.—*Visto:* Noviembre 9, 1950. *Resuelto:* Enero 31, 1951.

*César Andréu Ribas,* abogado del apelante; *Hon. Procurador General Vicente Géigel Polanco, J. Rivera Barreras, Fiscal del Tribunal Supremo* y *Frank Vizcarrondo Vivas, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tribunal.

Antonio Castro Pérez fué acusado de haber dado muerte allá para el 14 de octubre de 1947 a Cristino Colón Matos, alias Ladrillo. La teoría de El Pueblo fué que durante casi todo el referido día el apelante anduvo en un *taxi* acompañado de Michel Matienzo, Rafael Cuevas y Tutti Coll Carpintero en busca de Colón Matos; que éste pasó ese día en casa de Ramona López en la jurisdicción de Carolina y que al regresar de allí hacia el Club Copacabana venía acompañado de Andrés Torres, Harry Lake Penn y Cristóbal Agosto Ferrán; que después de tomar el automóvil de Colón Matos y sus acompañantes la calle Wilson y de doblar por la calle Duffaut, éste se detuvo a su derecha junto a la acera del Teatro Paramount; que Colón Matos venía acostado en el asiento trasero del automóvil por haber estado tomando licor y estuvo dormido durante todo el trayecto; que al detenerse en el sitio de referencia despertaron a Colón Matos, quien se bajó del automóvil en cuerpo de camisa, frotándose los ojos con un pañuelo; que en ese momento apareció el acusado Antonio Castro Pérez, que acababa de bajarse de un taxi,

se acercó rápidamente a Colón Matos y le dijo: "Mira, Cristino. . . ."; que Colón Matos se detuvo sin sospechar lo que iba a ocurrir y se volvió, y entonces el acusado, sin mediar provocación ni más palabras que las indicadas, hizo varios disparos a Colón Matos que le produjeron la muerte y que una vez realizado ese acto Castro Pérez tomó nuevamente el taxi y se dió a la fuga, a gran velocidad.

La teoría del acusado, según se expresó por uno de sus letrados ante el jurado, fué que actuó en defensa propia.

El juicio del caso duró muchos días, ofreciendo tanto el ministerio público como la defensa abundante prueba testifical y documental. Terminado el desfile de la prueba y luego de los informes de las partes y de las instrucciones de rigor, el jurado rindió veredicto condenatorio de asesinato en segundo grado, sentenciando entonces la corte a Castro Pérez a sufrir de 20 a 30 años de presidio, con trabajos forzados. De esa sentencia apeló y para sostener su recurso señala siete errores, que serán discutidos en el orden en que figuran en su alegato.

██ Sostiene en primer lugar el apelante que el tribunal inferior "erró al permitir que se presentara prueba de dos alegados delitos de extorsión supuestamente cometidos por el acusado. . . .", estando esos casos pendientes de juicio ante el mismo tribunal. De los autos se desprende que mientras el fiscal examinaba a uno de los señores del jurado con el propósito de determinar si procedía o no recusarle, dicho funcionario preguntó a éste qué opinión le merecía un "extorsionista". Se opuso la defensa a que se hiciera tal pregunta en presencia del jurado y la corte resolvió que esa cuestión podía ser discutida más tarde. Así se hizo, reuniéndose las partes posteriormente en la cámara del juez y exponiendo aquéllas sus respectivos puntos de vista, luego de lo cual la corte concluyó que no había habido perjuicio alguno para el acusado. La defensa solicitó la reconsideración de esa resolución y al ser la misma denegada se anotó una excepción.

Se desprende igualmente de los autos que con anterioridad a ello ya la defensa había preguntado a uno de los jurados si no había leído en la prensa sobre unos casos de extorsión ". . . . que los fiscales dijeron que habrían de arrestar y acusar a fulano y perencejo". Asimismo, que con posterioridad al incidente primeramente reseñado la propia defensa preguntó a varios señores del jurado si habían leído alguna información relacionada con algún delito de extorsión y que luego, en el curso del juicio, la propia defensa se refirió a extorsionistas y al delito de extorsión y preguntó a algunos de los testigos si habían pagado dinero a Antonio Castro Pérez "por temor"; que al propio acusado se le preguntó por el fiscal, sin la oposición de la defensa, si había sido arrestado por un delito de extorsión por orden del fiscal Gerena Bras y que éste contestó afirmativamente. También aparece de la transcripción de evidencia que mientras declaraba el testigo Francisco María Quiñones el fiscal inquirió de éste si ". . . . en alguna ocasión usted le ha pagado algún semanal a Antonio Castro Pérez", contestando el testigo que "yo una vez le daba cuarenta pesos semanales . . . . bueno, por temor"; y que la defensa lejos de objetar a esa pregunta y a la contestación, preguntó al propio testigo si "¿Recuerda haber venido a fiscalía antes de ahora, citado por el compañero Viera Martínez y haber usted dicho que usted nunca le había pagado ningún dinero a Antonio Castro Pérez por temor?" Resulta, por tanto, paladino que el acusado al hacer preguntas sobre extorsionistas y sobre el delito de extorsión, renunció a su excepción originalmente anotada. *Pueblo* v. *Cirino*, 69 D.P.R. 525, 531. Habiendo renunciado su excepción, el apelante no puede ahora suscitar esa cuestión en apelación ante este Tribunal. *Pueblo* v. *Figueroa*, 59 D.P.R. 918, 919; *Pueblo* v. *Miranda*, 56 D.P.R. 601, 604; *Pueblo* v. *Silva*, 17 D.P.R. 607, 608. Además, a petición del propio acusado la corte instruyó al jurado que ". . . los señores del jurado . . . no deberán tomar en cuenta para nada cualquier manifestación que se hubiere hecho de cualquier

delito de extorsión contra el acusado. . . . ." Bajo esas circunstancias el primer error no fué cometido.

■ Imputa el apelante en segundo lugar al tribunal inferior haber errado al negarse a admitir en evidencia el récord del Negociado de Investigaciones Federales suscrito por J. Edgar Hoover, acreditativo de que el occiso Colón Matos había sido convicto por delito de robo a mano armada en la ciudad de Nueva York. No existe tal error. El documento ofrecido en evidencia era claramente inadmisible. La mejor evidencia de una sentencia condenatoria contra el interfecto Colón Matos la hubiera sido copia de dicha sentencia debidamente certificada por el funcionario correspondiente de la corte que la dictó. *Pueblo* v. *Valentín*, 35 D.P.R. 118; *People* v. *Reinhart*, 39 Cal. 449; Wharton's *Criminal Evidence*, Vol. I, 11a. ed. 1935, pág. 630, sección 395; Op. cit. Vol. 3, pág. 2197, sección 1320; 20 Am. Jur. pág. 376, sección 420. Y no se demostró al tribunal en forma alguna el motivo por el cual no se ofrecía la evidencia primaria.

■ Tampoco erró la corte "al no permitir que la defensa presentara prueba sobre el carácter peligroso y mala reputación de los acompañantes del occiso". Conforme se ha indicado, el acusado alegó la defensa propia. Su prueba tendió a demostrar que durante toda la tarde del día de referencia él, acompañado de los individuos ya mencionados, había estado tratando de verse con varias personas que le servirían de testigos en diversos casos que contra él se seguían ante la Corte Municipal de Río Piedras, por haber él agredido algunas semanas antes a Miguel Soto Zaragoza en uno de los hipódromos de aquella jurisdicción; que entre diez y media y once de la noche el acusado, quien había dejado en el Parque Sixto Escobar a los amigos que le acompañaban, se desmontó del taxi y caminó a pie por la calle Duffaut hacia la casa de Julio Toro Luzunaris, uno de los testigos que buscaba; que casi al entrar a dicha calle vió a tres hombres, entre ellos a Colón Matos; que éste dijo: "Mira, ahí está ese sinvergüenza"; que Cristino le disparó en se-

guida, haciéndole otro disparo inmediatamente, y que enton-
ces él disparó tres o cuatro veces contra Cristino. Nada hay,
sin embargo, en la prueba de cargo o de descargo que demues-
tre que los acompañantes de Colón Matos atacaran, o hicie-
ran ademán de atacar, en forma alguna al acusado.

Cuando un acusado alega la defensa propia, si se ofrece,
puede admitirse en evidencia prueba tendiente a demostrar
el carácter pendenciero de la víctima mediante actos especí-
ficos de violencia. *Pueblo* v. *Rivera*, 67 D.P.R. 280, 286;
*Pueblo* v. *Cruz*, 65 D.P.R. 172. Empero, evidencia que tienda
a probar el carácter impetuoso de los acompañantes de la víc-
tima tan sólo es admisible cuando existe prueba demostrativa
de que éstos en alguna forma participaron en el supuesto
ataque del interfecto contra el acusado. 64 A.L.R. 1047;
26 Am. Jur. 397, sección 350; Warren *on Homicide*, Vol. 2,
pág. 790, sección 230; Wigmore *on Evidence*, Vol. II, 3ra.
ed., pág. 52, sección 246 (c); Abbott's *Criminal Trial Prac-
tice*, 4ta. ed., pág. 888; *State* v. *Kelly*, 195 N.W. 614, 616;
*Tiffany* v. *Commonwealth*, 15 Atl. 462. No existiendo prueba
de clase alguna que tienda a demostrar que los acompañantes
de Colón Matos participaran en el supuesto ataque de éste
contra el acusado, el tribunal a quo actuó acertadamente al
negarse a admitir evidencia sobre la mala reputación de
tales acompañantes.

■■ También alega el acusado que el tribunal inferior
cometió error "al permitir que el jurado se disgregara y
se separara, concurriendo algunos de sus miembros en com-
pañía de los alguaciles a una jira o acto social en el barrio
Cubuy de Canóvanas, mientras se encontraban bajo la cus-
todia del márshal de la corte antes de serles sometido el caso
para su resolución".

Después de comenzar el juicio la corte no permitió que
el jurado se disgregara, ordenando siempre que al ir a tomar
las comidas o a dormir éste permaneciera unido y bajo la
custodia de los alguaciles. Luego de haberse trabajado en

la vista del caso por varios días y al recesar un sábado en la tarde la corte, dirigiéndose al jurado, se expresó así: "Vamos a recesar hasta el lunes a las nueve de la mañana. A los señores jurados siento decirles que no deberán separarse, ni deberán hablar con nadie ni entre sí respecto a los hechos de este caso hasta tanto el mismo les haya sido definitivamente entregado a ustedes para su deliberación; no permitirán que persona alguna se les acerque a hablarles, ni aún el márshal. La corte dispone que cualquiera de ustedes que quieran ir a sus casas a ver a sus hijos puede hacerlo siempre y cuando vaya acompañado de un márshal". El lunes siguiente, mientras se examinaba en corte abierta a los alguaciles sobre la forma en que custodiaban al jurado, uno de los letrados del acusado preguntó al alguacil auxiliar Carreras si éste había participado en la jira celebrada en la casa de uno de los jurados. Carreras contestó que el sábado inmediatamente anterior los jurados Conde y Ocasio fueron a sus casas acompañados del alguacil Rodríguez, que ayer domingo él había acompañado a los jurados Correa y J. A. Rodríguez a sus respectivas residencias, y que casi todos los otros fueron a la casa del jurado Natividad Pagán a comerse un lechón que allí había. Investigada la cuestión ampliamente por la corte, se desprende que lo ocurrido en síntesis fué que acompañados del alguacil y de un alguacil auxiliar varios jurados fueron a casa del jurado Natividad Pagán a almorzar; que se les sirvió lechón asado y no se tomó licor de clase alguna; y que fuera del jurado y los alguaciles, los únicos extraños a ellos que en la casa estaban lo fueron la esposa de Pagán y las hijas de éste. No demostró la prueba, sin embargo, que allí se hablara del caso que se estaba ventilando o que alguien se acercara a los señores del jurado para hablarles en relación con el mismo. La corte concluyó que no se había desobedecido su orden "en el sentido de que el jurado no estuviese en ningún momento fuera del alcance de los márshals".

De acuerdo con el artículo 260 del Código de Enjuiciamiento Criminal:

"Artículo 260.—A los jurados que hayan sido juramentados para juzgar un proceso, se les puede permitir, a discreción del tribunal, en cualquier tiempo antes de someterse la causa a su deliberación que se separen o pongan bajo la custodia de un oficial competente. Éste debe prestar juramento de mantenerlos juntos hasta la próxima sesión del tribunal, y de no consentir que nadie, incluso él mismo, les hable o se comunique con ellos, acerca de ningún particular relacionado con el juicio, y de regresar con ellos al tribunal el día de la próxima sesión."

Y según el artículo 261 del mismo cuerpo legal:

"Artículo 261.—Cada vez que suspenda la sesión el tribunal, también deberá éste advertir a los jurados, ya se les permita separarse, o queden a cargo de oficiales del tribunal, que es su deber no conversar entre sí, ni con otra persona, acerca de ningún particular relacionado con el proceso, ni formar o expresar juicio alguno sobre el mismo, hasta que la causa haya sido sometida definitivamente a su deliberación."

A pesar de que según los anteriores preceptos la corte podía autorizar que los jurados, después de juramentados para juzgar el proceso se separaran, conforme se ha indicado, ella no permitió que éstos se disgregaran, ordenando por el contrario que éste estuviera siempre bajo la custodia inmediata de los alguaciles. Autorizó, sin embargo, que bajo las condiciones específicas que indicó, éstos pudieran separarse, pero siempre bajo la custodia inmediata de los márshals.

El autorizar que una vez iniciado el juicio el jurado se separe es cuestión que descansa enteramente en la sana discreción del juez que preside la causa. Artículos supra y 8 Cal. Jur., pág. 383, sección 414; y cuando la corte no ha autorizado tal separación, el mero hecho de que el jurado se separe en violación de la orden de la corte no da lugar a la revocación de la sentencia, a menos que el acusado demuestre que a virtud de la separación sus derechos substanciales han sido lesionados. Op. cit. pág. 424, sección 449;

34 A.L.R. 1158; 79 A.L.R. 830; *People* v. *Martin*, 87 C.A.2d 581, 590, 197 Pac. 2d 379; *People* v. *Walther*, 27 C.A.2d 583, 81 Pac. 2d 452. Véase especialmente el caso de *People* v. *Bemmerly*, 98 Cal. 299, en el cual, refiriéndose a una situación similar a la aquí envuelta, la Corte Suprema de California dijo que "El mero hecho de que se violara la orden de la corte no da al acusado derecho a que se deje sin efecto el veredicto," y que "El acusado debe demostrar, tal cual si no se hubiese dado la orden, que uno o más de los señores del jurado fueron influídos en su veredicto por alguna fuerza extraña durante tal separación o como consecuencia de ella." Aunque no aprobamos la actuación de los alguaciles en el incidente reseñado, como la prueba demuestra que los jurados estuvieron en todo momento bajo la inmediata custodia y presencia de dichos alguaciles y como la corte inferior concluyó que no se influyó en forma alguna en el ánimo de los jurados en relación con el caso que se ventilaba, no es posible concluir que se cometiera el error señalado. *Cf. Pueblo* v. *Goitía*, 41 D.P.R. 941, 943.

■ Por el quinto error se atribuye al tribunal sentenciador haber errado "al hacer manifestaciones, gestos y comentarios indicativos de su opinión sobre el testimonio de los testigos de defensa, dando lugar a que el jurado interpretara las actuaciones de la corte como indicativas de la incredulidad del juez hacia la prueba de defensa." Al discutir este error el acusado sostiene que la actuación del tribunal siempre aparece tocada de pasión, prejuicio y parcialidad en contra del acusado. Mientras declaraban los testigos Francisco Velázquez, Jefe de la Policía Insular, y Cristóbal Agosto Ferrán, el fiscal se opuso a ciertas preguntas de uno de los letrados del acusado y la corte sostuvo sus objeciones. También declaró sin lugar ciertas objeciones de la defensa a preguntas hechas por el ministerio público. Hemos leído la transcripción de evidencia con el mayor cuidado y no creemos que las imputaciones de la defensa encuentren apoyo en los autos.

Tampoco erró el tribunal inferior al permitir "que durante el juicio se arrestara y procesara por perjurio al testigo de la defensa Cristóbal Agosto Ferrán". Éste admitió que su declaración fué tomada a máquina por un taquígrafo y que la firma que aparecía al calce de la misma había sido puesta por él en el cuartel, mas no en presencia del fiscal auxiliar Gerena Bras.(¹) Como el contenido de esa declaración jurada era fundamentalmente distinto y contrario a lo declarado por el testigo durante el juicio, a él se le hicieron innumerables preguntas respecto a las discrepancias existentes entre una y otra declaración. Una vez que las partes terminaron de interrogar a Agosto Ferrán la corte ordenó al márshal que retirara al jurado y en ausencia de éste inquirió: "¿El señor fiscal va a ofrecer prueba de refutación en relación con la declaración ésa?" y el fiscal replicó: "Nosotros ofrecimos la declaración como identificación para luego ofrecerla como prueba en el turno nuestro; está identificada ya". A base de lo antes reseñado el acusado alega que fué la propia corte, movida por su parcialidad en el caso, la que insinuó al fiscal que debía presentar prueba de refutación. No estamos de acuerdo. El fiscal no podía ofrecer en evidencia la declaración jurada del testigo Agosto Ferrán mientras desfilaba la prueba de la defensa. Al solicitarse que se identificara esa declaración jurada, lo menos que podía inferirse era que en su oportunidad dicho funcionario ofrecería en evidencia tal declaración para determinar si el jurado debía dar crédito o no al testimonio oral de Agosto Ferrán. *Pueblo* v. *Lebrón,* 61 D.P.R. 657, 673; *Pueblo* v. *Ríos Flores,* 71 D.P.R. 969. Además, de la transcripción de autos aparece que al finalizar su prueba el fiscal anunció que utilizaría a Víctor Barrios como testigo de refutación. La imputación de que fué la corte la que a iniciativa propia insinuó al fiscal que debía ofrecer

---

(¹) El fiscal Gerena Bras fué llamado posteriormente como testigo de refutación y manifestó que esa declaración fué suscrita por el propio Agosto Ferrán en su presencia, en un cuarto de la casa del declarante.

semejante prueba carece, por tanto, enteramente de fundamento.

Cuando, como hemos indicado más arriba, el fiscal contestó que ofrecería prueba de refutación, la corte, estando todavía el jurado ausente, ordenó al márshal que se hiciera cargo del testigo. Solicitó la defensa entonces que se le informara con qué propósito se hacía eso y la corte manifestó que no estaba obligada a informarle en aquel momento qué habría de hacer con el testigo. Posteriormente, y en ausencia también del jurado, la corte dictó una orden decretando el arresto y detención de Agosto Ferrán por el delito de desacato por perjurio en corte abierta. Ella estaba autorizada para hacerlo así a tenor de lo provisto en la sección primera de la Ley núm. 41 de 1911 (pág. 136; Código Penal, ed. 1937, pág. 69). *Cf. Pueblo* v. *Aquino*, 33 D.P.R. 255, 261. Empero, de los autos no aparece que el jurado se enterara en forma alguna de este incidente, pues si bien se le permitía leer la prensa después de recortársele todo lo relacionado con el juicio, no se le autorizaba, sin embargo, a oír programas por radio ni que persona alguna, incluyendo los alguaciles, se comunicara con ellos en relación con el caso. No vemos, pues, cómo esa actuación de la corte pudo perjudicar los derechos del acusado. Por tanto, su proceder se ajustó a derecho.

▮ Finalmente alega el apelante que el tribunal sentenciador erró "Al negarse a trasmitir al jurado las instrucciones especiales solicitadas por la defensa, y especialmente sobre defensa propia". Las instrucciones especiales solicitadas por el acusado, no trasmitidas por la corte, fueron las siguientes: "(*a*) Que el acusado en este caso ha alegado que el homicidio estuvo justificado porque actuó en defensa propia. Se les instruye al efecto de que el acusado no viene obligado a establecer mediante prueba preponderante, o preponderancia de la evidencia aportada en el juicio la alegación de defensa propia. Si el jurado entiende que hay duda en cuanto a si el acusado actuó o no en defensa propia al

cometer el homicidio por el cual se le juzga, entonces se les instruye específicamente que deben resolver esa duda en favor del acusado y absolverlo. (*b*) En este caso el Fiscal renunció al testimonio de varios testigos de cargo, a saber: Víctor Barrios, Virgilio Reyes, Cristóbal Agosto Ferrán, Fernando Gerena y Lucy Sánchez Viuda de Colón. La Ley de Evidencia en su artículo 102, inciso 5, dispone lo siguiente: 'Que toda evidencia voluntariamente suprimida resultará adversa si se ofreciere'. Esta presunción se vió confirmada en la realidad en este caso ya que la defensa puso a declarar a dos de dichos testigos de cargo, Fernando Gerena y Cristóbal Agosto Ferrán, y su testimonio resultó adverso a la prueba de cargo. (*c*) PRUEBA DE REPUTACIÓN.—Debe descansar únicamente en la que marca la ley y no en rumores, informaciones de la prensa, radio u otros medios. Debe tomarse en cuenta para que el jurado estime quién, si el acusado o el interfecto, inició la contienda.''

Las instrucciones dadas, conforme veremos, incluían en términos generales, en tanto en cuanto las mismas se ajustaban a derecho, las especiales denegadas. En adición a las instrucciones corrientes sobre defensa propia, la corte manifestó que ''Si los señores del jurado creen que no se ha realizado ningún delito, porque no se ha justificado que la muerte de Cristino Colón Matos se deba a acto alguno del acusado, o si creen que no se ha probado en manera alguna su culpabilidad, *o si creen que el acusado actuó en legítima defensa propia al encontrarse con el interfecto y que tuvo motivos razonables para creer que estaba en peligro inminente de perder su vida, o de sufrir grave daño corporal, si tienen duda de ello, razonable y fundada, entonces, en cualesquiera de esos casos, debe el jurado declarar al acusado no culpable.*''

Es innegable que el acusado no está en la obligación de probar la defensa propia más allá de duda razonable y que si en la mente del jurado existe tal duda respecto a si el acusado actuó o no en defensa propia, es el deber de éste absolverle. *Pueblo* v. *González*, 69 D.P.R. 574. La instruc-

ción arriba copiada en la forma en que fué trasmitida claramente dió a entender al jurado que si tenía duda razonable respecto a si el acusado actuó o no en defensa propia era su deber declararlo no culpable. Las palabras "si tienen duda de ello, razonable y fundada" se referían también a la creencia que pudiera tener el jurado respecto a si el acusado actuó en legítima defensa propia al encontrarse con el interfecto.

Después que el ministerio público presentó el testimonio de doce testigos, anunció a la corte que ése era el caso de El Pueblo y que quería decirle al tribunal que si bien aparecían varios testigos al dorso de la acusación los mismos no serían llamados a declarar porque su testimonio constituiría prueba acumulativa y porque el testimonio de otros podría ser utilizado en refutación. A instancias de la defensa el fiscal dió los nombres de esos testigos y manifestó, como ya hemos indicado, que Víctor Barrios sería utilizado posiblemente en refutación. Inmediatamente la defensa expuso la teoría de su caso y comenzó el desfile de su prueba. Sobre la supresión de evidencia la corte instruyó al jurado como sigue: "Se ha alegado por la defensa que los fiscales suprimieron prueba, que de haber sido traída, hubiese sido adversa a los fiscales. Los fiscales al terminar su prueba anunciaron en corte abierta, que unos testigos que nombraron, serían sus testimonios de carácter acumulativo; y la defensa tuvo oportunidad de cambiar impresiones con esos testigos para determinar si los habría de utilizar o no. Aunque ellos fueran utilizados por la defensa, la renuncia de prueba de carácter acumulativo no es la supresión voluntaria de prueba a que se refiere el estatuto. El fiscal no está obligado a presentar toda la evidencia de que puede disponer para sostener las alegaciones de la acusación. Cuando, a su juicio, un hecho esté probado, puede renunciar al resto de la prueba de que dispone para establecer el mismo hecho. La defensa utilizó algunos de esos testigos; ustedes han oído sus testimonios. Ustedes han de resolver si esos testimonios, tal como fueron

vertidos por esos testigos, que renunció el fiscal, era prueba contradictoria a la teoría del fiscal, o prueba acumulativa a la teoría del fiscal, en cuyo caso rige la regla de que, prueba o testimonio de testigos voluntariamente renunciados se deberá considerar como prueba adversa". La instrucción en la forma en que fué dada claramente comprendía la especial solicitada, no habiendo, en su consecuencia, razón para que la corte trasmitiera esta última. *Pueblo* v. *Dones*, 56 D.P.R. 211, 221.

La instrucción dada por la corte sobre reputación fué la siguiente: "La defensa ha traído prueba para demostrar la mala reputación del interfecto. No puede probarse el carácter violento, vengativo o sanguinario del interfecto para excusar o atenuar el homicidio, pues la muerte sin que haya habido provocación de un hombre malo es un asesinato, tanto como lo sería la muerte de la persona más pacífica y respetuosa de la ley en la comunidad. Cuando se ha presentado evidencia tendiente a probar la defensa propia o las circunstancias en que se realizó el hecho estuvieran en duda, la reputación del interfecto como hombre violento y peligroso pueden probarse con el propósito de demostrar que el acusado tenía una razonable aprensión de peligro inminente, especialmente bajo las circunstancias prevalecientes en el momento del homicidio." Aunque no podría decirse que la instrucción en la forma que fué trasmitida comprendía la totalidad de la especial solicitada, no vemos qué perjuicio pudo sufrir el acusado con la negativa de la corte a darla, especialmente habiendo ella permitido durante el juicio que se presentara abundante prueba sobre el carácter turbulento y pendenciero de la víctima. *Cf. Pueblo* v. *Valentín*, 63 D.P.R. 787, 793, 794.

*No habiéndose cometido ninguno de los errores señalados, debe confirmarse la sentencia apelada.*