COMMONWEALTH of Pennsylvania,
Appellee

v.

Tyrone THOMAS, Appellant.

Superior Court of Pennsylvania.

Submitted April 15, 2013.
Filed May 21, 2013.

Suzane M. Swan, Scott B. Rudolf, Public Defender, Pittsburgh, for appellant.

Michael Streily, Deputy District Attorney, Rebecca G. McBride, Assistant District Attorney, Pittsburgh, for appellee.

BEFORE: STEVENS, P.J., BOWES, J., and MUSMANNO, J.

OPINION BY STEVENS, P.J.

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Allegheny County following Appellant's negotiated guilty plea to various charges in connection with the shooting death of Mark Barry and the subsequent shooting of a weapon into the occupied home of Portia Smithson. Appellant, who was sixteen years old when he committed the crimes, contends the trial court abused its discretion in denying his pre-trial motion to decertify this case from the adult division to the juvenile division. We affirm.

The relevant facts and procedural history are as follows: Following his arrest in connection with the March 14, 2010 shooting death of a retired firefighter, Mark Barry, Appellant was charged in the adult division of the trial court with criminal

homicide, robbery, carrying a firearm without a license, and criminal conspiracy.[1] Additionally, following his arrest in connection with the March 21, 2010 shooting into the occupied residence of Portia Smithson, Appellant was charged in the adult division of the trial court with two counts of aggravated assault, four counts of recklessly endangering another person, one count of conspiracy, one count of discharging a firearm into an occupied structure, and one count of possessing a firearm by a minor.[2] Upon notice by the Commonwealth, the cases were joined, and on July 2, 2010, Appellant filed a counseled motion seeking to decertify the criminal proceedings and transfer the cases to the juvenile division.

Following a hearing on the matter, the trial court denied Appellant's motion to decertify the criminal proceedings, and on May 2, 2011, Appellant proceeded to a guilty plea hearing, at which the Commonwealth set forth the facts underlying the charges as follows:

[As to case number CP–02–CR–0004968–2010,] [t]his incident occurred on March 14 of 2010. The victim in this case, Mark Barry, who was 55 years old and a retired firefighter for the City of Pittsburgh, was a resident of the North Side, Marshall–Shadeland area. He was walking his dog on Mullins Street, at which time he was fatally shot. He was shot once in the chest, which pierced his heart, and once in the arm.

Shortly after 10:00 p.m., on [March 14], his body was found lying on his back on Mullins Street, approximately 40 feet off of Woodland Avenue. Two nine-millimeter casings were also found at the scene by the police.

The victim was declared dead at the scene by paramedics. Dr. Xu of the Allegheny County Medical Examiner's Officer performed the autopsy and found that the cause of death was a gunshot wound of the trunk, and the manner of death, homicide.

Homicide detectives investigated this case and reviewed video surveillance from a camera placed by a neighborhood group that was located at Shadeland Avenue and at Woodland Avenue, and the video showed the victim walking down the street with his dog, followed by four young males.

The police were able to identify these four young males, who included [Appellant] and Cordell Brown, who was the co-defendant.

During the course of their investigation, the detectives also learned that the victim—the bullet that killed the victim was a nine millimeter.

A week later, also, the detectives learned of the shooting of Portia Smithson's house, which is involved in the other criminal investigation—criminal information which I'll get to.

The detectives, Weismantle and Hoffman, of city homicide, interviewed [Appellant], on March 31st of 2010, after they had spoken with his uncle and got permission for him to come down to homicide and speak with them. He signed a Miranda rights form, waived his rights to remain silent, and to an attorney, and gave the following statement.

[Appellant] stated that on the day of the killing, he, Cordell Brown, and another young man named Larry Brown

---

1. 18 Pa.C.S.A. §§ 2501, 3701, 6106, and 903, respectively. This case was docketed in the lower court at CP–02–CR–0004968–2010.

2. 18 Pa.C.S.A. §§ 2702, 2705, 903, 2707.1, and 6110, respectively. This case was docketed in the lower court at CP–02–CR–0002359–2011.

and another one named Derek, later identified as Derick Ambush, were spending the day together. [Appellant] admitted that on that day he was carrying a firearm on his person that he bought from someone a couple months earlier. It was a nine-millimeter Hi-Point semiautomatic pistol.

They were sitting on a porch of a house located on Woodland Avenue when one of the young men said I want some money, and the four young men discussed doing a robbery and agreed to rob the first person they saw.

Following their conversation, they saw the victim walking his dog. Cordell Brown said there's our first victim, and they began to follow the victim on Woodland Avenue, where they were viewed by the video cameras.

As the victim turned onto Mullins Street, [Appellant] said that Cordell Brown approached the victim and asked him if his dog—does your dog bite? The victim laughed in a polite way and said no, he's a good fellow. [Appellant] says that Cordell Brown then pulled the gun from his right side and shot the victim twice.

[Appellant] said that although he had been carrying the gun, he gave the gun to Cordell Brown immediately before the confrontation with the victim, Mark Barry.

[Appellant] said they were unable to actually rob the victim because the dog guarded the victim's body. They ran away to a girl's house, and when he left there, [Appellant] took the pistol with him.

He also was found not to possess a license to carry that firearm, in addition to being under 21 years old, and therefore, statutorily incapable of possessing a firearm.

That would be the case at [CP–02–CR–0004968–2010]. The second case, [CP–02–CR–0002359–2011], occurred exactly one week later, on the following Sunday night, on March 21st of 2010, approximately 1:30 a.m. The residence of Portia Smithson, located at 1100 Hall Street, also on the North Side of the City of Pittsburgh, was shot at numerous times.

Ms. Smithson and her boyfriend were in her second-floor front bedroom, along with a one-year-old infant, when numerous gunshots came through the window, which shattered powder from the doorway or the wall landed on the baby. They fled from the room and called the police. There were numerous bullet holes in the bedroom.

Also in the residence at the time of the shooting was Krista Kellem, another one of the named victims, and—well, Samuel Mitchell, who's the boyfriend. There were also two 14-year-olds and, as I said, the baby.

The detectives processed the scene and found a number of bullets, spent bullets, bullet holes and eight nine-millimeter casings on the street across from the residence.

Examination by the Allegheny County Medical Examiner's Office revealed that the casings used in this incident had been fired from the same firearm as was used in the incident involving the murder of Mark Barry. . . .

When the detectives interviewed [Appellant], about the death of Mark Barry, they also asked him about the shooting of Portia Smithson's house, and [Appellant] admitted that he had used the same firearm to shoot up Portia Smithson's house.

The motive for that was that Portia Smithson had earlier been involved in an altercation with a friend of his, Larry

Brown, and had stabbed Larry Brown. And this was also verified by the police. They have police reports on that.

As I said, [Appellant] did not possess a license to carry a firearm in either incident.

N.T. 5/2/11 at 18–24.

The Commonwealth noted:

Your Honor, in exchange for [Appellant's] plea as to the following charges [at CP–02–CR–0004968–2010], the Commonwealth will recommend to the Court [an aggregate] sentence of 40 to 80 years.

The charges would be as to count one, third-degree murder, and the other charges as the Court has listed them and read them to [Appellant].

We would suggest that the Court sentence, to get the 40 to 80, 20 to 40 on criminal homicide, 10 to 20 on robbery, 10 to 20 on criminal conspiracy, and then a concurrent sentence on the carrying a firearm without a license.

And [Appellant], I believe, is pleading guilty to a second information. . . .that would be [CP–02–CR–0002359–2011]. And we would agree to a concurrent sentence as set by the Court on that.

N.T. 5/2/11 at 4–5.

Thereafter, the trial court, indicating it accepted the plea agreement, sentenced Appellant as follows:

[At CP–02–CR–0004968–2010], on the charge of criminal homicide, wherein [Appellant] has entered a plea of guilty to murder in the third degree, a sentence of not less than 20 nor more than 40 years is imposed.

At count two, charging robbery, a sentence of not less than 10 nor more than 20 years is imposed, this sentence to run consecutively to the sentence at count one.

At count four, criminal conspiracy, a sentence of not less than 10 nor more than 20 years is imposed. This sentence to run consecutively to count one and two, for a sentence of not less than 40 nor more than 80 years.

On the charge of carrying a firearm without a license, a sentence of not less than three-and-a half to seven years is imposed concurrently with the previously imposed sentences.

At [CP–02–CR–0002359–2011], at counts one, two and three, aggravated assault, two counts of aggravated assault [and] the charge of criminal conspiracy, a sentence of not less than three nor more than six years is imposed at each of those counts, running consecutively with one another, for a sentence of not less than nine nor more than eighteen years. This sentence also to run concurrently with the previously imposed sentence on the criminal homicide, robbery and criminal conspiracy.

N.T. 5/2/11 at 28–29.

This timely, counseled appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

▬▬ Appellant's sole issue on appeal is the trial court abused its discretion in denying his motion to decertify the criminal proceedings and transfer his case to the juvenile court division.

The Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, is designed to effectuate the protection of the public by providing children who commit 'delinquent acts' with supervision, rehabilitation, and care while promoting responsibility and the ability to become a productive member of the community. 42 Pa.C.S.A. § 6301(b)(2). The Juvenile Act defines a 'child' as a person who is under eighteen years of age. 42 Pa.C.S.A. § 6302. Typically, most crimes involving juve-

niles are tried in the juvenile court of the Court of Common Pleas.

Our legislature, however, has deemed some crimes so heinous that they are excluded from the definition of 'a delinquent act.' Pursuant to 42 Pa.C.S.A. § 6322(a) and § 6355(e), when a juvenile is charged with a crime, including murder or any of the other offenses excluded from the definition of 'delinquent act' in 42 Pa.C.S.A. § 6302, the criminal division of the Court of Common Pleas is vested with jurisdiction.[3] *See* 42 Pa. C.S.A. § 6302[.]

When a case involving a juvenile goes directly to the criminal division, the juvenile can request treatment within the juvenile system through a transfer process called 'decertification.' To obtain decertification, it is the juvenile's burden to prove, by a preponderance of the evidence, that transfer to the juvenile court system best serves the public interest. 42 Pa.C.S.A. § 6322(a).

Pursuant to § 6322(a), the decertification court shall consider the factors contained in § 6355(a)(4)(iii) in determining whether the child has established that the transfer will serve the public interest. These factors are as follows:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly . committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or institutional reports, if any;

(IX) any other relevant factors[.]

42 Pa.C.S.A. § 6355(a)(4)(iii).

While the Juvenile Act requires that a decertification court consider all of these factors, it is silent as to the weight assessed to each by the court. However, '[w]hen a juvenile seeks to have his case transferred from the criminal division to the juvenile division, he must show that he is in need of and amenable to treatment, supervision or rehabilitation in the juvenile system.' If the evidence presented fails to establish that the youth would benefit from the special features and programs of the juvenile system and there is no special reason for sparing the

---

**3.** In the case *sub judice,* in the cases docketed at CP–02–CR–0004968–2010 and CP–02–CR–0002359–2011, there is no dispute Appellant, at a time when he was sixteen years old, committed numerous crimes, which were excluded from the definition of "delinquent act." For instance, he committed the crime of murder, armed robbery, and aggravated assault with a deadly weapon. *See* 42 Pa. C.S.A. § 6302 (defining "delinquent act").

youth from adult prosecution, the petition must be denied and jurisdiction remains with the criminal division.

The ultimate decision of whether to certify a minor to stand trial as an adult is within the sole discretion of a decertification court. This Court will not overturn a decision to grant or deny decertification absent a gross abuse of discretion. An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment based upon partiality, prejudice or ill will.

*Commonwealth v. Brown*, 26 A.3d 485, 491–493 (Pa.Super.2011) (quotations, quotation marks, citations, and emphasis omitted) (footnote added).

Here, Appellant argues the trial court abused its discretion in concluding Appellant was not "amenable to treatment" and could not be rehabilitated prior to the expiration of the juvenile court's jurisdiction.[4] Ultimately, he argues he proved, by a preponderance of the evidence, a transfer to juvenile court would have best served the public interest.

In explaining its evaluation of the relevant factors and the reasons it denied Appellant's request for decertification, the trial court indicated, in pertinent part, the following:

Th[e] court considered each of the [factors listed in Section 6355(a) ]. The first five weighed heavily in favor of denying [Appellant's] petition. [For instance,] [t]he impact on Mark Barry was clear; he was murdered in the street as he walked his dog. His death was absolutely pointless. When approached by [Appellant] and his accomplices, [Mark] Barry did not resist or attempt to flee.

He was simply shot to death, without warning. It was [a] cruel and senseless killing.

[Appellant's] cruelty and lack of remorse was further evidenced by the fact that only one week after he participated in [the] murder of Mark Barry, he fired eight times into a house occupied by 6 people, including two teenagers and a one-year-old infant. The bullets were fired into a room where the infant was and struck close enough [t]o spray the baby with plaster dust when the bullets pierced the walls. Luck is all that prevented the deaths of yet more innocent people. [Appellant's] conduct, in one week, impacted the lives of seven people, killing one and nearly killing six more.

This conduct also clearly impacted the community by sowing fear of more senseless violence. The nature and circumstances of these offenses; the remorselessness demonstrated by the act of firing eight times into a home one week after the killing of Mark Barry, clearly established that [Appellant] posed a profound threat to the public. [Appellant] [participated in the taking of one] human life and seemed determined to take more. Everyone in his community was at risk while he roamed the streets in possession of the gun he used in these offenses.

His culpability for both offenses was clear. He agreed to commit a robbery and provided his accomplice with the weapon used to kill their intended victim, [Mark Barry]....He was also solely culpable for the offenses [at Ms. Smithson's house] ... where he admitted that he was the shooter in that incident.

The sixth factor requires that the court consider ' ... the adequacy and

---

4. We note the juvenile court's jurisdiction ends when the juvenile turns twenty-one years old. *See Commonwealth v. Ruffin*, 10 A.3d 336 (Pa.Super.2010).

duration of dispositional alternatives available . . .' under the juvenile act and in the adult criminal justice system. The dispositional alternatives available under the Juvenile Act were inadequate. At the time of the offenses, [Appellant] was sixteen (16) years, two (2) months old. At the time that this case was disposed of in May of 2011, he was seventeen and a half (17 ½). That he engaged in such horrendous criminal acts at that age indicates advanced criminal sophistication such that it would have been unlikely that he could be rehabilitated prior to the expiration of juvenile jurisdiction; which would occur in January 5, 2015, when [Appellant] turned 21. The four years of supervision that he would have had in the juvenile system would have been clearly insufficient to address the factors that caused [Appellant] to engage in such horrific acts at such a young age. The only acceptable dispositions were those available solely in adult criminal court.

While this court considered all of the evidence presented by [Appellant] at the [de]certification hearing and weighed the factors required, the court concluded that the nature of these offenses, the likely lack of amenability of [Appellant] to rehabilitation, the harm done to the victims and to the community by his acts and the continuing danger he would pose to the community if he were released at the age of twenty-one (21), greatly outweighed the evidence presented by [Appellant] and required the court to deny [Appellant's] petition.

Trial Court Opinion filed 8/10/12 at 8–11.

We find no abuse of discretion and conclude the record fully supports the trial court's determination that Appellant failed to prove, by a preponderance of the evidence, transferring this matter to juvenile court would serve the public interest. The serious nature of the charges, the impact on the victims and the community, Appellant's age, and the evidence establishing Appellant's lack of amenability to treatment, supervision, and rehabilitation in the juvenile system all militated against a finding that decertification was appropriate. *See Brown, supra.* With regard to the latter factor, we note Appellant has been diagnosed with various mental disorders, he has a history of fighting, and he has a history of aggression towards others. N.T. 2/2/11 at 10–11. The Commonwealth's expert witness, psychiatrist Bruce Wright, M.D., specifically opined Appellant is not amenable to treatment and rehabilitation in the juvenile justice system and testified as follows in support thereof:

[This is based on] his very severe history of psychiatric problems primary conduct disorder childhood onset, which is severe in nature. He has other psychiatric problems, including attention deficit disorder, depression, possible learning disorder and possible psychotic disorder. And there's other factors that would [not] be categorized as a psychiatric illness. But other factors that were important in my opinion. That includes his very limited insight into his history of psychiatric and behavioral problems, limited support system, family history which is important, not only because of the upbringing but because of the genetic load he has for severe psychiatric illness. His history of deceit that was evident in my examination, and in general a very cold and calloused nature or personality structure.

\*     \*     \*

We heard from Dr. [Alice] Applegate that once he shot a dog, but the records even back to Western Psych suggested that he was involved in animal cruelty, kicking the family dog, destruction of property, repeatedly running away from

home, gang involvement, truancy, things like that.

\* \* \*

He has a legal history that includes assault, firing a BB gun, beating some-body up and when they are on the ground, kicking them, vandalism, run-ning away from home, truancy.

N.T. 2/4/11 at 98, 102.

The trial court accepted Dr. Wright's testimony in this regard. We shall not reweigh the evidence or substitute our credibility determinations for the trial court. *See Brown, supra.*

In light of all of the aforementioned, we find no merit to Appellant's sole issue pre-sented on appeal, and therefore, we affirm.

Affirmed.

BOWES, J., concurs in result.