J-S27005-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALEXANDER BRANDO HRIBAL | : | |
| | : | |
| Appellant | : | No. 697 WDA 2018 |

Appeal from the Judgment of Sentence January 22, 2018
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0002394-2014

BEFORE: OLSON, J., OTT, J., and COLINS*, J.

MEMORANDUM BY OLSON, J.: FILED OCTOBER 23, 2019

Appellant, Alexander Brando Hribal, appeals from the judgment of sentence entered on January 22, 2018 following his open guilty plea to 43 criminal charges related to a stabbing incident at Franklin Regional High School in Westmoreland County, Pennsylvania wherein 19 students and a security guard were injured. Upon careful review, we affirm.

The trial court summarized the facts of this case as follows:

The instant case arises out of a multiple victim stabbing incident at Franklin Regional High School on April 9, 2014. The Commonwealth allege[d] that [Appellant] brought two eight[-]inch butcher knives into the school which he used to stab and slash students. [Appellant] then set off the fire alarm causing students to exit rooms on the first and second floors of the Franklin Regional High School and continued to randomly strike students. A total of 19 students were injured, some of the injuries [were] life[-]threatening. [Appellant] attempted to stab [one] student, Brett Faiola; however, Mr. Faiola blocked the knife with his book bag at that time and was not wounded. In addition to the 19 students stabbed, [Appellant] also stabbed Sergeant John

_____

* Retired Senior Judge assigned to the Superior Court.

Resetar, who was a security guard at Franklin Regional High School, while he was trying to intervene. [Appellant] was ultimately apprehended by Sam King, one of the assistant high school principals. When Mr. King told [Appellant] to drop the knives, [Appellant] said, "I'm not going to drop the knives. My work here isn't finished. There's more people to kill." At this time, Joan Mellon, another assistant principal at Franklin Regional High School removed the knives from [Appellant's] hands, and Murrysville Police Officer, William Yashke arrived and handcuffed [Appellant].

\* \* \*

During the [subsequent] investigation, investigators obtained a search warrant to search [Appellant's] locker. The investigators discovered a statement titled "RAGNOROK" purportedly written and signed by [Appellant] and dated April 6, 2014. In the statement, [Appellant] declared his admiration for Dylan Klebold and Eric Harris who were responsible for killing 12 fellow students and one teacher and injuring 21 others at Columbine High School in Columbine, Colorado on April 20, 1999. The [statement] includes what could be described as an explicit plan to carry out the attack on the anniversary of the Columbine killings; however, since his school was closed on that day, he rescheduled the attack for April 9, 2012, the day of Eric Harris' birthday. In the statement, [Appellant] wrote, "I can't wait to see the priceless and helpless looks on the faces of the students of one of the 'best schools in Pennsylvania' realize their precious lives are going to be taken by the only one among them that isn't a plebian."

Trial Court Opinion, 5/9/2016, at 4-5 (record citations omitted).

On April 25, 2014, the Commonwealth charged Appellant as an adult[1] with 21 counts of attempted homicide, 21 counts of aggravated assault, and one count of possession of a weapon on school property.[2] On March 12, 2015, Appellant filed an omnibus pre-trial motion seeking, inter alia, decertification

_____

[1] Appellant was 16 years old at the time of the attack.

[2] 18 Pa.C.S.A. §§ 2502/901, 2702, and 912, respectively.

- 2 -

and transfer of his case to juvenile court. The trial court held decertification hearings on June 22, 2015 and November 24, 2015. By opinion and order entered on May 9, 2016, the trial court denied decertification to juvenile court.

On July 29, 2016, Appellant filed a motion to change his plea from not guilty to guilty but mentally ill. On November 21, 2016, the trial court conducted a hearing wherein Appellant presented the testimony of three mental health experts and the Commonwealth presented one mental health expert. The trial court denied relief regarding Appellant's request to plead guilty but mentally ill by order and opinion entered on February 2, 2017.

On October 24, 2017, Appellant entered a general guilty plea to the criminal charges filed against him, but left his sentence open for the trial court to decide. The trial court scheduled sentencing and ordered a pre-sentence investigation (PSI) report. On January 22, 2018, the trial court sentenced Appellant to an aggregate term of 23½ to 60 years of imprisonment. This timely appeal followed.[3]

_____

[3] Appellant filed a timely post-sentence motion on February 1, 2018, seeking modification of his sentence. The trial court denied relief on April 27, 2018. On May 3, 2018, Appellant filed a notice of appeal. The trial court entered an order on May 11, 2018, directing Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). After receiving an extension of time from the trial court, Appellant complied timely. The trial court subsequently issued an opinion pursuant to Pa.R.A.P. 1925(a) on July 19, 2018. In that opinion, the trial court also relied upon its earlier opinions issued on May 9, 2016 and February 2, 2017 as additional rationale for denying Appellant relief.

On appeal, Appellant presents three issues[4] for our review:

1. Whether the trial court erred in [] failing to grant [Appellant's] petition for decertification to the Juvenile Division?

2. Whether the trial court erred in failing to grant [Appellant's] motion to change [his] plea to guilty but mentally ill where the evidence presented clearly supported the motion and a plea of guilty but mentally ill.

3. Whether the trial court abused its discretion in imposing on [Appellant] an aggregate sentence of 23½ [] years to 60 years [of imprisonment] which sentence is excessive and unduly harsh.

Appellant's Brief at 4 (superfluous capitalization omitted; issue numbers added).

In his first issue presented, Appellant argues that the trial court abused its discretion by denying his decertification petition requesting transfer from criminal court to juvenile court pursuant to 42 Pa.C.S.A. § 6322. Id. at 12-25. He claims that he met his burden of proving by a preponderance of the evidence that the public interest was served by the transfer. Id. at 13. Appellant asserts that the trial court placed undue emphasis on the impact of the offenses on the victims and the community without giving meaningful consideration to the remaining factors under Section 6322. Id. at 13 and 24. More specifically, Appellant contends that the "community is working its way

_____

[4] Appellant included a fourth issue in the statement of questions involved section of his appellate brief, but abandoned that claim later in his argument. See Appellant's Brief at 4 and 33. We will not address it. See Commonwealth v. Heggins, 809 A.2d 908, 912 n.2 (Pa. Super. 2002) ("[A]n issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived.").

through the incident and has, for the most part, moved on from the incident."
Id. at 18. Appellant argues that based upon "the intense therapeutic regimen
that [he has] participated in," he is not a future threat to public safety. Id.
In sum, Appellant posits that "[a]ll of the defense mental health professionals
found that after examination and treatment of [Appellant], that he [] was
amenable to treatment in the juvenile justice system and that he and society
would be better served by his rehabilitation in the juvenile justice system."
Id. at 24.

This Court has previously determined:

The Juvenile Act, 42 Pa.C.S.A. § 6301 et seq., is designed to effectuate the protection of the public by providing children who commit 'delinquent acts' with supervision, rehabilitation, and care while promoting responsibility and the ability to become a productive member of the community. 42 Pa.C.S.A. § 6301(b)(2). The Juvenile Act defines a 'child' as a person who is under eighteen years of age. 42 Pa.C.S.A. § 6302. Typically, most crimes involving juveniles are tried in the juvenile court of the Court of Common Pleas.

Our legislature, however, has deemed some crimes so heinous that they are excluded from the definition of 'a delinquent act.' Pursuant to 42 Pa.C.S.A. § 6322(a) and § 6355(e), when a juvenile is charged with a crime, including murder or any of the other offenses excluded from the definition of 'delinquent act' in 42 Pa.C.S.A. § 6302, the criminal division of the Court of Common Pleas is vested with jurisdiction. See 42 Pa.C.S.A. § 6302[.[5]]

When a case involving a juvenile goes directly to the criminal division, the juvenile can request treatment within the juvenile

_____

[5] In this case, there is no dispute that the Commonwealth charged Appellant, who was 16 years old at the time of the incident, with multiple counts of attempted murder and aggravated assault, while using a deadly weapon. Those acts are excluded from the definition of delinquent act. See Pa.C.S.A. §§ 6302(2)(ii)(C) and 6302(2)(ii)(I).

- 5 -

system through a transfer process called 'decertification.' To obtain decertification, it is the juvenile's burden to prove, by a preponderance of the evidence, that transfer to the juvenile court system best serves the public interest. 42 Pa.C.S.A. § 6322(a).

Pursuant to § 6322(a), the decertification court shall consider the factors contained in § 6355(a)(4)(iii) in determining whether the child has established that the transfer will serve the public interest. These factors are as follows:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or institutional reports, if any;

(IX) any other relevant factors[.]

42 Pa.C.S.A. § 6355(a)(4)(iii).

While the Juvenile Act requires that a decertification court consider all of these factors, it is silent as to the weight assessed to each by the court. However, '[w]hen a juvenile seeks to have his case transferred from the criminal division to the juvenile division, he must show that he is in need of and amenable to treatment, supervision or rehabilitation in the juvenile system.' If the evidence presented fails to establish that the youth would benefit from the special features and programs of the juvenile system and there is no special reason for sparing the youth from adult prosecution, the petition must be denied and jurisdiction remains with the criminal division.

The ultimate decision of whether to certify a minor to stand trial as an adult is within the sole discretion of a decertification court. This Court will not overturn a decision to grant or deny decertification absent a gross abuse of discretion. An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment based upon partiality, prejudice or ill will.

Commonwealth v. Thomas, 67 A.3d 838, 841–843 (Pa. Super. 2013) (case citation and original footnote omitted). "As an appellate court, we are unable to usurp a trial court's credibility determinations." Commonwealth v. Ramos, 920 A.2d 1253, 1260 (Pa. Super. 2007) (citation omitted).

In its opinion regarding decertification, the trial court considered each of the factors set forth at 42 Pa.C.S.A. § 6355(a)(4)(iii) in relation to the facts of this case. Regarding the impact the offenses had on the victims, the trial court heard testimony from six Franklin Regional High School students, five of whom received injuries. Trial Court Opinion, 5/9/2016, at 6. Two of the testifying students required over a month of hospitalization and numerous

surgeries. Id. 6-8. There was testimony that the majority of the witnesses had subsequent flashbacks, nightmares, and Post-Traumatic Stress Disorder (PTSD), which required intensive counseling and therapy. Id. The trial court found "that the testimony of the witnesses and the nature of the injuries [], clearly rise to the level of having significant, life[-]changing impact on the victims." Id. at 8.

Regarding the impact on the community, the trial court heard testimony from four Franklin Regional High School staff members, a student who witnessed her brother's stabbing, and a victim's parent. Id. at 9-10. The trial court heard testimony that, when returning to school following the incident, teachers and students remained traumatized daily by triggering sounds and the sight of knives. Id. Despite therapy, witnesses to the crimes still experienced flashbacks and nightmares. Id. As a result, the trial court determined that while "the students and staff are making significant progress[,] many individuals are still coping with the events that occurred on April 9, 2014." Id. at 10-11. Moreover, the trial court determined that the alleged crimes affected the community as a whole because "expectations of safety in schools and homes were significantly impacted[.]" Id. at 11.

The trial court next addressed the threat to the safety of the public, nature and circumstances of the alleged offenses, and the degree of the child's culpability. Id. at 11-13. More specifically, the trial court determined:

> [...Appellant's] actions of taking two kitchen knives and bringing them to school without anyone noticing, pulling the fire alarm so there would be more potential victims available to him, indicating

that 'he has more people to kill,' resisting apprehension, and writing the statement titled 'RAGNOROK,' [Appellant] displayed a level of sophistication in carrying out these acts. The [trial c]ourt [found] that [Appellant] created a specific plan to harm as many people as possible and had the motivation and capability to execute that plan. The crimes were unprovoked, and [Appellant] knew several of the students since elementary school. Additionally, [Appellant's] own words and actions signif[ied] that [Appellant] not only intended to wound others, but wished to kill as many people as possible. The [trial c]ourt reviewed the [statement] entitled 'RAGNOROK,' found in [Appellant's] school locker which had been written by [Appellant]. The [trial c]ourt believe[d] that this letter could be interpreted as evidence of [Appellant's] sophisticated and well thought plan to injure and/or cause the death of many individuals.

Id. at 12-13.

Furthermore, the trial court examined the adequacy and duration of dispositional alternatives and whether Appellant was amenable to treatment, supervision or rehabilitation in the juvenile system. The trial court heard testimony from the unit manager of State Correctional Institution (SCI) Pine Grove who testified that SCI Pine Grove has a program for young offenders, under the age of 22, prosecuted as adults, and the trial court found it to be "an adequate dispositional alternative in the adult criminal justice system." Id. at 13-14. The trial court also heard testimony from four mental health experts,[6] but the trial court found the Commonwealth's expert, Dr. Bruce Wright, to be credible. Dr. Wright testified that he could not say with any degree of medical certainty that Appellant was amenable to treatment or could

_____

[6] Appellant presented testimony from Dr. Alan Axelson, Dr. Christine Martone, and Dr. Bruce Chambers. The Commonwealth presented testimony from Dr. Bruce Wright.

- 9 -

be rehabilitated in the juvenile system because despite intensive therapy, Appellant continued to have episodes of depression, problems with interpersonal relationships, and suicidal and homicidal ideations. Id. at 16-17.

The trial court ultimately concluded:

Simply put, [the trial c]ourt [found] that the risk of [Appellant's] relapse, potential for re-offending in a similar manner, now, or upon his release at age 21, and many unknown and unpredictable psychological/psychiatric factors, to outweigh the likelihood that [Appellant's] re-entry into our community would be safe and of no concern to the community. This is not to detract from any progress [Appellant] has made while he has been intensively counseled by his team of psychiatrists and psychologists while in the custody of the Westmoreland County Detention Center and the Westmoreland County Prison. The [trial c]ourt believe[d] that [Appellant] received intensive and highly professional care while in custody. [That] progress, however measured, and regardless of prognosis, [did] not quell what the [trial c]ourt view[ed] as a real and serious risk to the community as a whole, if [Appellant were] released from custody upon reaching his 21st birthday, which would necessarily occur [following] decertif[ication.]

Upon review of the factors contained in 42 Pa.C.S.A. § 6355(a)(4)(iii), the [trial c]ourt [found] that [Appellant had] not established by a preponderance of the evidence that the transfer of his case [would] serve the public interest. Furthermore, the [trial c]ourt [found] that the juvenile system [could not] adequately address the myriad of concerns expressed by the Commonwealth's expert[, Dr. Wright,] within the remaining time leading up to [Appellant's] 21st birthday.

Id. at 17.

Upon review, we discern no abuse of discretion in denying decertification. Initially, we reject Appellant's contention that the trial court did not adequately examine all of the factors under Section 6322. As set forth

above, the trial court addressed each factor individually. Moreover, the trial court was permitted to view the impact of the crimes on the victims and the community as the most significant factors in denying a transfer to juvenile court, as the Juvenile Act is silent as to the weight to be assigned by the court as to each Section 632 factor. Additionally, the trial court found the Commonwealth's expert credible and endorsed his opinion that the juvenile system could not rehabilitate Appellant before his anticipated release upon turning 21 years of age. The record supports that conclusion and we will not usurp that determination. Based upon our standard of review, we discern no abuse of discretion and conclude that the trial court properly denied decertification to juvenile court. Accordingly, Appellant's first issue lacks merit.

In his second issue presented, Appellant argues that the trial court erred by failing to grant his motion to change his plea to guilty but mentally ill. Appellant's Brief at 25-28. In support of this argument, Appellant posits, in sum:

> On November 21, 2016, the [trial c]ourt conducted a [m]ental [i]llness [h]earing [at which Appellant] presented testimony from Dr. Alan Axelson, M.D., Dr. Christine Martone, M.D., and Dr. Bruce Chambers, Ph.D.

> Dr. Axelson testified at the hearing that he had diagnosed [Appellant] with a depressive disorder with psychotic features, possible early onset schizophrenia and schizotypal personality disorder traits which he considered 'very serious mental illness.' Axelson also testified that[,] at the time of the incident in April 2014[, Appellant] knew the difference between right and wrong, but that, in his opinion, [Appellant] was mentally ill and not able to appreciate the consequences of his actions.

Dr. Martone testified at the hearing that she had diagnosed [Appellant] and that on the date of the incident [Appellant] was not legally insane[,] but mentally ill and not able to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

Dr. Bruce Chambers testified that he administered a [psychological test called the Minnesota Multiphasic Personality Inventory (MMPI)] on his first interview with [Appellant] on April 14, 2014 and that the results of the test clearly showed that [Appellant] was suffering from severe mental illness which he diagnosed as psychotic depression and/or prodromal schizophrenia. In his final report[,] Dr. Chambers indicated that from his history, mental status evaluation and psychological testing results, it was evident that [Appellant] was suffering from a mental illness which significantly impaired his ability to conform to the law at the time of the incident.

[...T]he Commonwealth presented testimony, in opposition to [Appellant's] motion [to change his plea to guilty but mentally ill], from Dr. Bruce Wright. Wright opined that although [Appellant] had a psychiatric illness, the psychiatric illness did not cause him to substantially lack the capacity to conform his behavior to the requirements of the law nor did it affect the ability to conform his behavior in any respect over the half a year or longer prior to the incident [in] April 2014.

A full analysis of the evidence presented by the defense confirmed unequivocally that at the time of the incident in April 2014, [Appellant] was mentally ill and lacked the capacity to conform his behavior to the requirements of the law or to appreciate the wrongfulness of his conduct. Accordingly, [Appellant] requests that this [] Court find that the [trial] court abused its discretion in denying his [motion to change his plea to guilty but mentally ill] and order the matter returned to the [trial c]ourt for proceedings consistent with the entry of a [g]uilty [b]ut [m]entally [i]ll plea.

Appellant's Brief at 27-28.

The statutory provision governing the "guilty but mentally ill" defense

provides, in relevant part:

§ 314. Guilty but mentally ill

(a) General rule.—A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense.

(b) Plea of guilty but mentally ill.—A person who waives his right to trial may plead guilty but mentally ill. No plea of guilty but mentally ill may be accepted by the trial judge until he has examined all reports prepared pursuant to the Rules of Criminal Procedure, has held a hearing on the sole issue of the defendant's mental illness at which either party may present evidence and is satisfied that the defendant was mentally ill at the time of the offense to which the plea is entered. If the trial judge refuses to accept a plea of guilty but mentally ill, the defendant shall be permitted to withdraw his plea. A defendant whose plea is not accepted by the court shall be entitled to a jury trial, except that if a defendant subsequently waives his right to a jury trial, the judge who presided at the hearing on mental illness shall not preside at the trial.

(c) Definitions.—For the purposes of this section and 42 Pa.C.S.A. § 9727 (relating to disposition of persons found guilty but mentally ill):

> (1) "Mentally ill." One who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

*    *    *

18 Pa.C.S.A. § 314.

In examining the trial court's decision, we employ a de novo standard of review for an error of law and our scope of review is plenary. In re Miles, 170 A.3d 530, 534 (Pa. Super. 2017); Commonwealth v. Rabold, 951 A.2d 329, 340 (Pa. 2008).

Furthermore, we have stated:

[T]he "guilty but mentally ill" law and the diminished capacity standard, like the insanity defense, place great burdens on the trier of fact. Unlike the "reasonable man" standard in negligence law which asks the factfinder to compare a defendant's behavior with the usual or proper societal behavior, these ask the factfinder to look into the psyche of the defendant and discern its innermost workings. It is a most difficult assignment. As an appellate court with only the cold, lifeless record to guide us, we naturally defer to the trier of fact who heard the witness' tone of voice, saw their facial expressions and presumably caught the [proceeding's] subtleties-all of which may be lost in the written word.

Commonwealth v. Cain, 503 A.2d 959, 971 (Pa. Super. 1986). "It is solely the province of the trier of fact to pass upon the credibility of witnesses and to give it such weight as may be accorded to the evidence therein produced. The factfinder is free to believe all, part or none of the evidence." Commonwealth v. Shaver, 460 A.2d 742, 745 (Pa. 1983) (hearing judge sitting as the trier of fact found the psychiatrist's testimony was too "vague, evasive and equivocal").

In this case, the trial court determined:

Upon a review of the [m]ental [i]llness [h]earing transcript, the professional reports prepared by the expert witnesses, and the briefs submitted by the parties, [the trial c]ourt [was] of the opinion that although [Appellant] may have suffered from a psychotic illness, his illness did not cause him to substantially lack the capacity to appreciate the wrongfulness of his conduct or conform his behavior to the requirements of law on April 9, 2014 for the following reasons:

First, the [trial c]ourt [found] that [Appellant's] planning and preparation leading up to the April 9, 2014 incident can clearly be interpreted as evidence that [Appellant] had the substantial capacity to appreciate the wrongfulness of his conduct and conform his behavior to the law. A review of the testimony and the reports prepared by the mental health professionals, reveals that [Appellant] first began planning for this event in September

- 14 -

of 2013 when he researched indirect suicide and became familiar with the Columbine tragedy. Next, [Appellant] selected a significant date to carry out the attack. He had originally planned to carry out the attack on the anniversary of the Columbine killings; however, since [Franklin Regional High School] was closed that day, he rescheduled the attack for April 9, 2014, the day of Eric Harris' birthday.[7] Prior to the incident, [Appellant] wrote a statement titled RAGNAROK in which he referred to the attack as a "violent action," "monstrosity," and "crime." In the statement, [Appellant] wrote, "I can't wait to see the priceless and helpless looks on the faces of the students of one of the 'best schools in Pennsylvania' realize their precious lives are going to be taken by the only one among us who isn't a plebian." During an interview with Dr. Chambers, [Appellant] stated that he "practiced not feeling anything in his mind while envisioning the actions he was planning to take" and he "tried to be numb as he did not want to feel anything to prevent him from completing his mission."

In light of [Appellant's] actions in the preparation of this attack, his statements contained in the RAGNAROK letter, and his answers to questions posed by several mental health professionals, the [trial c]ourt [found] that the opinions offered by Dr. [Bruce] Wright, credibly support a finding that [Appellant] not only understood that what he was doing was wrong, but that he was aware of the foreseeable consequences of his actions. In particular, [Appellant] reported to several mental health professionals that he did not plan on surviving the attack. [Appellant] expressed concern for the pain this incident would inevitably cause friends and family. Additionally, [Appellant] reported feeling empathy and sympathy for the victims.

Likewise, the [trial c]ourt [found] that [Appellant] was able to conform his behavior to the law [as] evidenced by the fact that he was able to maintain other lawful behaviors leading up to the April 9, 2014 incident. On the date of the incident, [Appellant] obtained and concealed two kitchen knives and brought them into the school without anyone noticing the knives. There [was] no evidence to suggest that [Appellant] disclosed his plan to anyone. In fact, there was no indication that anyone in his life, such as his family, teachers, or peers noticed any psychotic symptoms

_____

[7] As previously mentioned, Eric Harris was one of the Columbine High School shooters.

whatsoever prior to the date of the incident. Dr. Wright testified that although it is not impossible, it would be extremely unlikely for someone close to [Appellant] to not observe any of these symptoms. Additionally, [Appellant] performed well academically and there were no reports of behavioral problems at home or at school.

Second, the [trial c]ourt [found] that the manner in which [Appellant] carried out the April 8 2014 incident demonstrate[d] that [Appellant] had the substantial capacity to appreciate the wrongfulness of his conduct and conform his behavior to the law. The [trial c]ourt [found] that [Appellant] engaged in a well organized and sophisticated plan to commit a deliberate act, namely killing as many people as possible. After bringing in two eight inch butcher knives into the school and beginning to stab and slash students, [Appellant] set off the fire alarm in an attempt to lure more victims out into the hallway. When [Appellant] was finally apprehended and instructed to drop the knives, [Appellant] said, "I'm not going to drop the knives. My work isn't finished. There's more people to kill." Once apprehended, [Appellant] reported that he no longer felt that Eric Harris and Dylan Klebold were controlling him from hell and once he was taken to the police station, he realized it was wrong. Dr. Wright testified that he never heard of an individual who had a psychotic disorder instantaneously improve.

Third, the [trial c]ourt [found] that [Appellant's] statements to different medical professionals and his reported history of symptoms after the April 9, 2014 incident appear inconsistent and raise concerns regarding reliability of a diagnosis of a psychotic disorder. During an interview with Dr. Wright, [Appellant] reported that he felt he was "being controlled from hell by Harris and Klebold." To the contrary, however, the reports prepared by Dr. Axelson, Dr. Martone, and Dr. Chambers are devoid of any indication that [Appellant] felt "controlled" by Eric Harris and Dylan Klebold. When interviewed by Dr. Axelson, [Appellant] stated that he "felt a connection with the intent of Dylan Klebold and Eric Harris." Drs. Martone['s] and Chambers['] reports indicate[d] that [Appellant] was "obsessed" with Columbine and felt as if he was on a "mission" to commit a similar attack at Franklin Regional High School. Additionally, Dr. Axelson's report indicated that [Appellant] remembered getting the kni[ves] from the kitchen, but he did not remember the actual episode; however, Dr. Martone's and Dr. Chambers' reports indicate that

[Appellant] remembered the episode and began to feel empathy and sympathy for the victims.

Contrary to [Appellant's] responses found in Dr. Wright's report, [Appellant] never reported any history of hallucinations or delusions to Dr. Martone or Dr. Chambers and initially, neither doctor diagnosed [Appellant] with a psychotic illness. It wasn't until subsequent evaluations that the doctors' opinions changed based on [Appellant's] statements indicating a more severe illness. Additionally, there is no mention in the RAGNOROK letter, which was dated three days prior to the attack, that [Appellant] felt he was being controlled by the Columbine perpetrators.

As there [were] different accounts of the psychotic symptoms to different professionals, it raise[d] concern with [the trial c]ourt as to the reliability of a [diagnosed] psychotic disorder. [The trial c]ourt [found] the testimony of Dr. Wright to be credible and agree[d] with his opinion that inconsistency over the course of time raise[d] concerns whether [Appellant] actually had those symptoms at all, or the magnitude described.

Although the [trial c]ourt [found] that [Appellant] may have suffered from a psychotic illness, [it was] of the opinion that [Appellant] possessed the capacity to appreciate the wrongfulness of conduct and substantially conform his conduct to the law on April 9, 2014. Thus, [it concluded] that [Appellant did] not meet the criteria for entering a plea of guilty but mentally ill.

Trial Court Opinion, 2/2/2017, at 9-13 (record citations omitted).

We agree with the trial court's determination that Appellant failed to establish that he was guilty but mentally ill at the time of the incident. Initially, we note that Appellant asks us to credit his experts' opinion over the opinion of the Commonwealth's expert. We cannot. It was within the trial court's province to rely upon Dr. Wright's testimony as credible and we will not usurp that credibility determination. Upon review of the record, Dr. Wright

testified that Appellant appreciated the wrongfulness of his conduct,[8] but planned a detailed, concealed criminal plan and then carried it out anyway. Appellant described the incident as "a monstrosity, a violent act, and a crime." N.T., 11/21/2016, at 99. As such, Dr. Wright opined that Appellant "knew what he was doing was wrong." Id.

In determining that Appellant deliberately chose not to conform his behavior to the requirements of the law, Dr. Wright noted:

> [...Appellant] practiced trying not to feel. He tried to be numb so he could carry out this act, but as the act [] was occurring, he began to feel empathy for the victims. To me, that shows [] this was a deliberate, volitional act. He tried to train himself to do something that he knew was wrong. He had the capacity to know this was wrong, and he had the capacity to conform his behavior to the requirements of the law. He chose not to.

Id. at 100.

Dr. Wright also recognized that, over time, Appellant inconsistently changed his story to the other various mental health examiners. In turn, the defense experts changed their diagnoses, their opinions became "more severe with time," and that raised concern for Dr. Wright "about the reliability of [Appellant's] report of psychotic symptoms." Id. at 100-108.

Ultimately, Dr. Wright stated:

> [...]The fact that [Appellant] was empathetic and sympathetic, both words were used [by him], he knew that what he was doing was wrong.

_____

[8] Dr. Axelson, Dr. Martone, and Dr. Chambers all testified that Appellant could appreciate the difference between right and wrong at the time of the incident. N.T., 11/21/2016, at 9, 38, and 80.

\*　　　　\*　　　　\*

[Appellant] had a psychiatric illness. [] I don't disagree with that. But, it's my opinion that the psychiatric illness did not cause him to lack, to substantially lack the capacity to conform his behavior to the requirements of the law, nor did it affect his ability to conform his behavior in any respect over the half a year or longer prior to this [incident]. He was able to maintain other lawful behaviors. He was able to perform well in school. His behavior was not a problem at home. It's my opinion that this illness did not reach the magnitude that it affected his ability to conform his behaviors to the requirements of the law, or his behavior in any other respect.

Id. at 110-111.

Based on the foregoing, we discern no error in denying Appellant's request to plead guilty but mentally ill. While Appellant contends that this Court should accept his experts' opinions, the trial court was free to believe all, part, or none of the evidence presented. Instead, the trial court credited the testimony of the Commonwealth's expert who opined that Appellant was not guilty but mentally ill when committing the offenses at issue. Because the record supports the trial court's decision, we find no merit to Appellant's second appellate claim.

In his third issue presented, Appellant contends that the trial court abused its discretion by imposing an aggregate sentence of 23½ to 60 years of imprisonment.[9] Appellant's Brief at 28-33. Appellant claims he presents a

_____

[9] More specifically, the trial court sentenced Appellant at Count 35 of the criminal information to 16½ to 40 years of incarceration. At Counts 7, 13, 21, 23, 25, and 29, the trial court imposed terms of incarceration of 16½ to 40 years, concurrent to Count 35. At Count 1, the trial court sentenced Appellant to seven to 20 years of incarceration, consecutive to Count 35. At Counts 3,

substantial question to implicate our Court's review of the discretionary aspects of sentencing of this case because the trial court's application of the sentencing guidelines was clearly unreasonable. Id. at 30-32. Appellant also argues that "it is evident that the [trial c]ourt placed undue influence on the impact on the victims and the community and did not meaningfully consider [Appellant's] prior criminal record, age, personal characteristics and potential for rehabilitation." Id. at 32.

> We have previously determined:
>
> Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. Prior to reaching the merits of a discretionary sentencing issue[, w]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, see Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, see Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

Commonwealth v. Andrews, 213 A.3d 1004, 1016 (Pa. Super. 2019).

Here, Appellant filed a timely notice of appeal, preserved his sentencing claim in a post-sentence motion, and included in his appellate brief a statement of reasons relied upon pursuant to Pa.R.A.P. 2119(f). However, for

_____

5, 9, 11, 15, 17, 19, 37, 39, and 41, the trial court imposed sentences of seven to 20 years of incarceration, concurrent to Count 1. The trial court imposed no further sentence on the remaining charges. See N.T., 1/22/2018, at 80-82.

the reasons that follow, Appellant's claim does not raise a substantial question for our review.

> [A] defendant may raise a substantial question where he receives consecutive sentences within the guideline ranges if the case involves circumstances where the application of the guidelines would be clearly unreasonable, resulting in an excessive sentence; however, a bald claim of excessiveness due to the consecutive nature of a sentence will not raise a substantial question.

Commonwealth v. Dodge, 77 A.3d 1263, 1270 (Pa. Super. 2013). A claim that an aggregate sentence resulting from the imposition of consecutive sentences is excessive raises a substantial question if the "decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case." Id. at 1273 (citation omitted); see Commonwealth v. Moury, 992 A.2d 162, 171–172 (Pa. Super. 2010) ("The imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment."); see also Commonwealth v. Prisk, 13 A.3d 526, 533 (Pa. Super. 2011) (citation omitted) (An appellant is not entitled to receive a "volume discount" at sentencing for multiple offenses committed).

Here, Appellant does not explicitly challenge the consecutive nature of his sentences. However, by claiming that his aggregate sentence is excessive, he indirectly impugns the consecutive nature of his overall sentence, which does not raise a substantial question entitled to our review. Moreover, we do

not deem Appellant's aggregate sentence as excessive or unreasonable in light of the violent criminal conduct and number of victims at issue. Appellant pled guilty to 43 criminal offenses (42 of which are felonies) in connection with a stabbing incident at a high school that left 19 students and a security guard seriously injured and traumatized an entire community. Appellant's aggregate sentence is not clearly unreasonable or irrational in light of his criminal conduct. See 42 Pa.C.S.A. § 9781(c)(2) ("The appellate court shall vacate the sentence and remand the case to the sentencing court with instruction if it finds [] the sentencing court sentencing within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable."). Furthermore, Appellant was not entitled to a volume discount at sentencing merely because the crimes arose from one criminal episode. Appellant's claim that his sentence, comprised of consecutive standard range punishments imposed for multiple violent assaults, was unreasonable simply does not present a substantial question for review.

In conjunction, Appellant also claims that the sentencing court abused its discretion by failing to consider his personal circumstances and rehabilitative needs. However, failure to adequately consider mitigating factors generally does not raise a substantial question. Moury, 992 A.2d at 171. Thus, Appellant's claim that the trial court did not adequately consider mitigating factors before imposing his sentence does not raise a substantial question to implicate our review of the discretionary aspects of sentencing in

this case. Finally, even if we were to find that Appellant presented a substantial question, the trial court had the benefit of a PSI report and, thus, we presume that the trial court was aware of Appellant's prior criminal record, age, and personal characteristics. See Commonwealth v. Rhoades, 8 A.3d 912, 919 (Pa. Super. 2010) ("[W]here, as here, the sentencing court had the benefit of a [PSI] report, we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors."). As such, Appellant's final claim fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/23/2019